IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FREEDOM MEDICAL INC.          :     CIVIL ACTION
                              :
            v.                :
                              :
THOMAS R. GILLESPIE, III,     :
et al.                        :     NO. 06-3195

MEMORANDUM AND ORDER

McLaughlin, J.                          August 28, 2007


        Plaintiff Freedom Medical, Inc. ("Freedom Medical") is
in the business of purchasing and refurbishing medical equipment
and then reselling, renting, and servicing it.  In this suit,
Freedom Medical alleges that a number of former employees, along
with several corporations controlled by them and several
associated individuals, entered into a conspiracy to steal
Freedom Medical's inventory and business opportunities.  The
complaint names seventeen individual defendants and six corporate
defendants and brings claims for violations of the Racketeer
Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §
1961, et seq., as well as state law claims of misappropriation of
trade secrets, fraud, breach of fiduciary duty, conspiracy,
conversion, and breach of contract.

        Four groups of defendants, encompassing eight
individuals and two corporations, have moved to dismiss the

claims against them.[1]  All of the defendants moving to dismiss challenge the sufficiency of Freedom Medical's pleading concerning its RICO claims and all but one challenge the sufficiency of its state law fraud claims.  In the alternative, several defendants seek a more definite statement.  Several of the moving defendants also challenge the sufficiency of the allegations concerning the other state law claims.  In addition, defendant Gurmit Bhatia challenges this Court's personal jurisdiction over him and defendant Sandra "Dawn" Hall challenges whether the complaint, as a whole, adequately alleges that she participated in the alleged fraud and conspiracy.

This Court will grant the defendants' motions to dismiss in part.  The Court will dismiss the RICO claim alleged in Count I of the complaint as to all defendants named therein for failure to adequately allege a nexus between the validly pled enterprises in that count and a "pattern of racketeering activity."  The Court will also dismiss the fraud claim alleged in Count IV with respect to all defendants moving to dismiss it, on the ground that it is not pled with sufficient particularity.

---

[1]     The motions to dismiss are Defendant Dawn Hall's Motion to Dismiss Pursuant to 12(b)(6) (Docket No. 26); the Motion to Dismiss of Defendants Gurmit Bhatia, US Med-Equip, Inc., and Greg Salario (Docket No. 94); the Motion to Dismiss of Defendants Thomas R. Gillespie, III, Phillip Frayne, Patrick Frayne, and Lori Gillespie (Docket No. 96/97); and the Motion to Dismiss of Defendants George Rivera and American Medical Logistics, LLC (Docket No. 114).

The Court will deny the defendants' motions to dismiss as to the other claims of the complaint and will deny as moot defendant Dawn Hall's motion to strike.

I.   Background

The plaintiff's complaint alleges the following facts relevant to the defendants' motions to dismiss, all of which the Court will assume are true for purposes of evaluating the motions.

A.   The Relevant Parties

1.   The Plaintiff

Plaintiff Freedom Medical is a Pennsylvania medical equipment company founded in 1997.  It is in the business of buying, refurbishing, renting, and selling biomedical equipment. By October 2002, Freedom Medical operated 15 branch offices throughout the United States with over 100 employees.  By 2003, it had revenues of approximately $21.5 million.

2    The Gillespie Defendants:  Thomas Gillespie, Lori Gillespie, Phillip Frayne, and Patrick D. Frayne

Moving defendant Thomas Gillespie was hired as Freedom Medical's first employee in March 1997.  At the time of his hire, he was 24 years old and had no experience in the health care sector.  He rose rapidly in the company, and four years later, in

-3-

2001, he held the position of Vice President of Marketing and Sales.  In that position, among other responsibilities, he managed all equipment sales and purchases, the transportation of equipment to and from customers, and the repair and maintenance of equipment.  Gillespie was employed by Freedom Medical from 1997 until May 2006.

Moving defendant Lori Gillespie is Thomas Gillespie's wife and a former employee of Freedom Medical.  Moving defendants Phillip Frayne and Patrick Frayne are Lori Gillespie's brothers and Thomas Gillespie's brothers-in-law.  They are also both former employees of Freedom Medical.  Phillip Frayne was employed from January 2000 to March 2005 as an inventory prep technician and in warehouse operations.  Patrick Frayne was employed in unspecified positions from 1999 through June 2006.

> 3   The Salario Defendants:  Greg Salario, Gurmit
>     Bhatia, and U.S. Med-Equip, Inc.

Moving defendant Greg Salario was hired by Freedom Medical in August 1999 as Marketing Manager for the Houston branch.  By 2002, he had been promoted to overseeing all Freedom Medical branch operations except those in Florida and California. In this position, he worked closely with Thomas Gillespie, who supervised equipment purchasing, sales, and repair.  Salario also supervised other branch managers, including moving defendant

George Rivera, and non-moving defendants Joseph Janssens and Rick Burgess.

Greg Salario reported to Freedom Medical's president, Frank Gwynn.  In 2002, shortly after Salario was given supervising responsibility over all branches outside Florida and California, Gwynn requested that Salario provide him with monthly written reports on branch operations.  Salario resisted providing these reports.  In August 15, 2003, Gwynn gave him an ultimatum demanding these reports.  The next day Salario abruptly resigned.

Salario established moving defendant U.S. Med-Equip, Inc. ("US Med-Equip") in Texas in 2003, while he was still employed by Freedom Medical.  US Med-Equip, like Freedom Medical, was in the business of buying, refurbishing, renting, and selling biomedical equipment.

Moving defendant Gurmit Bhatia is one of US Med-Equip's owners, directors, and officers.  He is alleged to have actively participated in the management of US Med-Equip.

4     The Rivera Defendants:  George Rivera and American Medical Logistics, LLC

Moving defendant George Rivera was employed by Freedom Medical as Manager of its New York Metro branch beginning in August 1999.  He was terminated in December 2003 for non-performance, after revenue in the geographic area for which he was responsible began declining.

Rivera established moving defendant American Medical Logistics, LLC ("American Medical") in February 2004.  Both Rivera and Thomas Gillespie are alleged to have ownership interests in American Medical.

     5.   <u>Sandra "Dawn" Hall</u>

Non-moving defendant Cliff Hall was hired by Freedom Medical in October 2000 as a salesman.  His responsibilities included the purchase, sale, and rental of medical equipment.  He left Freedom Medical in June 2001.  After leaving Freedom Medical, Cliff Hall formed two companies, non-moving defendants Signature Medical Ltd., LLC ("Signature Medical") and Signature Emergency Products, LLC ("Signature Emergency"), both of which are companies in the business of buying, selling, renting, and servicing medical equipment.  Thomas Gillespie is alleged to have an ownership interest in Signature Medical and Signature Emergency.

Moving defendant Sandra "Dawn" Hall is Cliff Hall's wife.  She is alleged to be actively involved in the operations and management of both Signature Medical and Signature Emergency.

    B.   <u>The Alleged Pattern of Schemes to Defraud</u>

The basic allegation of Freedom Medical's complaint is that the individual defendants, led by Thomas Gillespie, Greg

-6-

Salario, and George Rivera, conspired to steal equipment and business opportunities from Freedom Medical and to falsely sell to Freedom Medical equipment that they did not own.  Freedom Medical alleges Gillespie, Salario, and Rivera, were later joined in this conspiracy by the other defendants.  The plaintiff alleges several types of wrongful behavior, including the theft of equipment from Freedom Medical and its suppliers, the diversion of business opportunities belonging to Freedom Medical to the defendants and their affiliates, and the fraudulent sale of equipment to Freedom Medical.  The plaintiff specifically alleges that the defendants stole the assets and business of Freedom Medical's emergency medical services division and its New York home infusion business.[2]

### 1.   The Theft of Equipment

Freedom Medical alleges that, as of 2001, Thomas Gillespie was responsible for its equipment inventory and controlled Freedom Medical's purchases and sales of biomedical equipment.  Using this position, Freedom Medical alleges that Gillespie personally stole Freedom Medical's equipment and coordinated and facilitated the theft of equipment by other

---

[2]   The Court's review of the complaint's allegations concerning the schemes to defraud focuses on the moving defendants and does not detail all of the allegations involving those defendants who have not moved to dismiss.

defendants.  The initial thefts of equipment were allegedly done by Thomas Gillespie, Greg Salario, Cliff Hall, and George Rivera, who then later recruited other lower-level employees to participate, including defendants Patrick and Phillip Frayne, Jason Ragazzo, Jasper Smith, Omar Hunt, and Martin Crouch.

In its complaint, Freedom Medical alleges that it has obtained documentation showing that moving defendants American Medical, Signature Medical, and US Med-Equip are all in possession of numerous pieces of equipment stolen from Freedom Medical.  Freedom Medical alleges that American Medical has 24 items of its equipment, Signature Medical has 148 items, and US Med-Equip has 70 items.  In addition to the stolen equipment in their possession, Freedom Medical alleges that the defendants have sold or otherwise disposed of extensive quantities of its equipment across state lines.

Freedom Medical also alleges that defendant Thomas Gillespie stole equipment sent to Freedom Medical from outside suppliers by diverting the equipment before it was logged into Freedom Medical's inventory and then falsely telling suppliers that their shipments were short.  Freedom Medical alleges as an example that, in early 2006, supplier Goldstar Medical sold and delivered 42 IV pumps to Freedom Medical, but Gillespie told Goldstar that Freedom Medical had received only 40 pumps.

-8-

Freedom Medical alleges that the two "missing" pumps were actually delivered, but diverted by Gillespie.

Freedom Medical further alleges that, in the course of an unspecified criminal investigation, non-moving defendants Jason Ragazzo, Omar Hunt, and Martin Crouch have admitted that they stole Freedom Medical equipment and sold it to Signature Medical at the behest of Signature Medical's owner, defendant Cliff Hall. These transactions were allegedly made "through defendants Phil Frayne, and/or Cliff Hall." Cliff Hall is alleged to have admitted that Signature Medical is in possession of equipment belonging to Freedom Medical.

In addition to stealing its equipment, Freedom Medical also alleges that the defendants sold some of that same equipment back to Freedom Medical after disguising its origin. Freedom Medical also alleges that the defendants stole equipment from other companies and sold some of that stolen equipment to Freedom Medical. As an example, Freedom Medical alleges that defendant US Med-Equip sold it $37,000 worth of equipment that was, in fact, owned by Baxter Healthcare and that US Med-Equip had no right or title to sell.

Freedom Medical alleges that these thefts involved transfers of equipment across state lines from Freedom Medical locations in Pennsylvania, Texas, Maryland, Louisiana, Nevada, New Jersey, and elsewhere to US Med-Equip in Texas and Indiana,

Signature Medical in Pennsylvania, and American Medical in New Jersey, and then to unknowing third parties.  Freedom Medical also alleges that each invoice concerning stolen property that was sent by the defendants to a purchaser constitutes a separate act of mail fraud.

### 2.   Diversion of Business Opportunities

Freedom Medical's complaint alleges that defendant Thomas Gillespie, as Freedom Medical's head of sales, was aware of all major business opportunities that came to the company. Freedom Medical alleges that Gillespie, in consultation with defendants Greg Salario, Cliff Hall, and George Rivera, together with Patrick Frayne who was an assistant sales manager reporting to Gillespie, channeled confidential information about those opportunities to US Med-Equip, American Medical, and Signature Medical.

Freedom Medical alleges that Gillespie or Frayne gave defendants Salario, Bhatia, and US Med-Equip information about Freedom Medical's pending pricing proposals, and this allowed US Med-Equip to undercut Freedom Medical's pricing.  Freedom Medical alleges this caused it to lose long-term customers to US Med-Equip in its Texas, Louisiana, and Indiana markets.  Freedom Medical also alleges that defendant Joseph Janssens, while employed as manager of Freedom Medical's Baltimore branch,

referred rental business opportunities to American Medical, including the opportunity to rent 15 suction pumps to Nanticoke Hospital in Maryland in August 2005.

Freedom Medical alleges that a company named American Imaging Systems offered to sell Freedom Medical "Baxter PCA II pumps" and "6201 and 6301 pumps" but was told by Gillespie that Freedom Medical was not interested.  Instead, Gillespie told American Imaging Systems that Signature Medical would purchase them.  Subsequently, Signature Medical allegedly wired a payment for this equipment, and the pumps were shipped to Gillespie's home address and then sold to Freedom Medical by "Med Logic," a non-existent corporation allegedly created by Gillespie to facilitate his scheme.

Freedom Medical alleges that this diversion of business was accomplished through unspecified false representations through the telephone or email and that these false representations constitute wire and mail fraud.  Freedom Medical alleges that Thomas Gillespie placed numerous calls to defendants Greg Salario, Phil Frayne, Signature Medical, Signature Emergency, George Rivera, American Medical Logistics, Gurmit Bhatia, and US Med-Equip and that all of these were predicate acts and part of a pattern of racketeering.

-11-

3    Diversion of Emergency Medical Services Business

Freedom Medical alleges that Thomas Gillespie and other defendants stole equipment and business opportunities related to its emergency medical services ("EMS") division.  This division was established in July 1999 in Nevada.  In late 2002, Freedom Medical relocated the division to Pennsylvania.  Thomas Gillespie was actively involved in the decision to transfer the EMS division and responsible for supervising its relocation.

Freedom Medical alleges that, at the same time the relocation was being planned, Thomas Gillespie and Cliff Hall launched a competing business, Signature Emergency.  Freedom Medical alleges that, during the transfer of its EMS business, Thomas Gillespie stole the proprietary and customized computer software that Freedom Medical used to market and manage its EMS division and used it to set up Signature Medical.  This software, called TELEMAGIC, was the primary information management tool for all important Freedom Medical EMS customer information.

Freedom Medical also alleges that Gillespie and Patrick Frayne and unspecified other defendants stole other Freedom Medical equipment to aid Signature Medical.  The complaint gives as an example a "Zoll M series Defibrillator" that Freedom Medical was to supply to a company called Sky Flight Care.  Thomas Gillespie allegedly removed the defibrillator from Freedom

Medical, but never delivered it and instead gave it to Signature Emergency.

### 4.   Diversion of New York Home Infusion Business

Freedom Medical alleges that its former employee Daniel Herasimtschuk worked with defendant George Rivera and other defendants to divert Freedom Medical's home infusion business in the New York area.  Rivera was branch manager of the New York office until 2003.  Herasimtschuk worked in the New York office until January 2005, when he formed a competing corporation, Complete BioMedical Services.  Freedom Medical alleges that Herasimtschuk left Freedom Medical in order to join with defendants George Rivera, Thomas Gillespie, Cliff Hall, Signature Medical, and American Medical in diverting Freedom Medical's business, particularly customers in its home infusion business. Freedom Medical alleges that as part of this scheme, Herasimtschuk and these other defendants stole Freedom Medical equipment and business opportunities.  In particular, Freedom Medical alleges that at least 62 pieces of stolen equipment were provided to Signature Medical, which then rented that equipment to Complete Biomedical Services.[3]

------------

[3]   Daniel Herasimtschuk, his wife Monica Herasimtschuk, and their company Complete Biomedical Services were originally named as defendants in this action, but have since been voluntarily dismissed by the plaintiff.

Freedom Medical alleges that as part of the diversion of the home infusion business, the defendants "coordinated their activities for the purpose of obtaining and using Freedom Medical's trade secrets in order to cause existing and potential customers to move their business."  Freedom Medical alleges some of these unspecified solicitation activities took place by telephone and through mailings and that some of these telephone conversations and mailings contained false representations by Herasimtschuk and "perhaps other defendants."

5.  Self-Dealing

Freedom Medical's complaint accuses defendant Thomas Gillespie of self-dealing.  Freedom Medical alleges that while Gillespie was Freedom Medical's Vice President of Sales and Marketing, he concealed his financial interest in competing companies Signature Medical, American Medical, and US Med-Equip and caused Freedom Medical to enter into transactions with them on unfavorable terms.

As an example, Freedom Medical alleges that Gillespie caused it to sell ten "Alaris Medsystem III" pumps to Signature Medical for $225 each, far less than the $675 that Freedom Medical had paid for them or the $800 for which Freedom Medical had sold the same pumps to other customers.  These pumps were allegedly then transferred to other defendants, with one pump

-14-

going to American Medical Logistics which sold it to a hospital for $800.

As another example, Freedom Medical alleges that Gillespie caused it to sell 44 "Defib Wall Mount Alarm Boxes" that Freedom Medical had purchased for $108 each to Signature Emergency at $25 each.  Signature Emergency then allegedly sold the alarm units to customers for $100 each.  Gillespie allegedly aided in those sales by diverting sales opportunities for such alarms from Freedom Medical to Signature Emergency.

C.    <u>The RICO Claims and the Alleged Enterprises</u>

Freedom Medical's complaint contains three RICO counts. Counts I and II allege violations of 18 U.S.C. § 1962(c), and Count III alleges conspiracy under 18 U.S.C. § 1962(d).  The substantive violations in Counts I and II allege separate enterprises and each are directed against different, but overlapping, sets of defendants.  The conspiracy allegations in Count III are based on the enterprise and defendants alleged in Count II.

1.    <u>The Count I Enterprises</u>

Count I is brought against a subset of all the defendants.  The Count I defendants are Thomas and Lori Gillespie, Greg Salario, George Rivera, Cliff and Dawn Hall,

Phillip and Patrick Frayne, Gurmit Bhatia, Signature Medical, Signature Emergency, American Medical, and US Med-Equip.  The Count I enterprises are Med Logic, Harbor Medical LLC ("Harbor Medical"), and Diversified Medical Systems, Inc. ("Diversified Medical").

Med Logic is alleged to be a fictional company created by Thomas Gillespie to act as a means for diverting business opportunities from Freedom Medical.  The plaintiff alleges that the defendants, acting through Med Logic, would purchase equipment from third parties and then sell it to Freedom Medical at inflated prices.  The plaintiff alleges that Thomas or Lori Gillespie listed a false corporate address for "Med Logic" to further the deception.

Harbor Medical is alleged to be a Louisiana limited liability company created by Thomas Gillespie, Greg Salario, and George Rivera in October 2001 to facilitate their scheme.  It allegedly had no employees or business operations but served "as an organizational conduit" for alleged racketeering activities.  Harbor Medical's charter was revoked by the state of Louisiana for unspecified reasons in 2006.

Diversified Medical is alleged to be a Pennsylvania corporation created by Thomas Gillespie in 1999 to engage in fraudulent activity, including the receipt and disposition of

stolen Freedom Medical equipment.  Thomas and Lori Gillespie are both alleged to be officers of the company.

The complaint lists three specific predicate acts concerning these enterprises, two involving Med Logic and one involving Harbor Medical.  None of the alleged predicate acts involve Diversified Medical.

Med Logic is alleged to have sold Freedom Medical numerous pieces of equipment at inflated prices.  In these sales, totaling approximately $110,000, Freedom Medical was never informed of Thomas Gillespie's ownership interest in Med Logic. Thomas Gillespie is alleged to have arranged to have Freedom Medical's payment to Med Logic made out to Gillespie personally, and some of those payments were in turn deposited into bank accounts owned by American Medical for which Gillespie had signing authority.

Med Logic is also alleged to have been used to facilitate the theft of 6 "Baxter I" pumps in August 2005. Thomas Gillespie purchased these pumps for Freedom Medical from a company named Goldstar Medical for $750 each.  Gillespie then diverted these pumps and sent them to US Med-Equip, paying for them with a check drawn on a bank account owned by American Medical.  US Med-Equip's co-owner, George Salario, allegedly told Gillespie that one of the pumps was defective and Gillespie told Salario to return it to him.  Gillespie then allegedly sold the

-17-

defective pump back to Freedom Medical by having Patrick Frayne prepare a fraudulent requisition form requesting the purchase. The defective pump was then sold to Freedom Medical by Med Logic for the inflated price of $1,500 in September 2005.

Harbor Medical is alleged to have been used in diverting business from Freedom Medical.  In January 2006, Thomas Gillespie delivered a presentation to potential purchasers from a company called MedOne.  Gillespie proposed that MedOne purchase patient monitors that Freedom Medical would then rent to customers with the revenue being shared between them.  Without Freedom Medical's knowledge, Gillespie allegedly induced MedOne to buy patient monitors from Harbor Medical for $28,500, which he represented was the best price for that equipment.  The address on the Harbor Medical invoice to MedOne is alleged to be that of defendant Greg Salario.  Gillespie then purchased patient monitors for a much lower price from another supplier, intending to resell those monitors through Harbor Medical to MedOne.  In purchasing these monitors, Gillespie falsely told the supplier that they were being purchased by Freedom Medical, but instead purchased them with his own personal credit card.

2.   The Count II Enterprises

Count II is brought against all named defendants.  The enterprise in this count is alleged to be an association-in-fact

of all defendants.  The complaint alleges that "[i]n addition to
any legitimate transactions," the association-in-fact conducted
the sale, rental, refurbishing, and repair of medical equipment
through a pattern of racketeering activity.  This pattern of
racketeering is alleged to be the fraudulent schemes discussed
above in section I.B.  The complaint alleges hundreds of
unspecified predicate acts of mail fraud, wire fraud,
transportation of stolen property, and possession of stolen
property.


             3.   <u>The Conspiracy Allegations of Count III</u>

        Count III alleges that all the named defendants, "being
persons employed by and associated with the enterprise described
in the paragraphs contained in Count II," conspired together and
with others "known and unknown" to conduct the affairs of the
association-in-fact alleged as the Count II enterprise.  The
pattern of racketeering in Count III are the same predicate acts
of mail fraud, wire fraud, transportation of stolen property, and
possession of stolen property as alleged in Counts I and II.


II.   <u>ANALYSIS</u>

        In considering a motion to dismiss pursuant to Rule
12(b)(6) of the Federal Rules of Civil Procedure, the Court
accepts as true all allegations in the complaint and all

reasonable inferences that can be drawn therefrom, viewing them
in the light most favorable to the plaintiff.  Taliaferro v.
Darby Twp. Zoning Bd., 458 F.3d 181, 188 (3d Cir. 2005).  A Rule
12(b)(6) motion should be granted only if it appears to a
certainty that no relief could be granted under any set of facts
that could be proved.  Id.


  A. The RICO claims – Counts I and II

   Of the three RICO counts in the complaint, Counts I and
II allege substantive violations and Count III alleges a RICO
conspiracy.  Because the existence of a RICO conspiracy rises or
falls on the existence of a substantive RICO violation, the Court
will first examine at length the adequacy of the pleading
concerning Counts I and II before turning to the adequacy of the
conspiracy claim.

   Counts I and II allege violations of 18 U.S.C.
§ 1962(c).  Section 1962(c) makes it "unlawful for any person
employed by or associated with any enterprise . . . to conduct or
participate, directly or indirectly, in the conduct of such
enterprise's affairs through a pattern of racketeering activity."
18 U.S.C. § 1962(c).

   To state a claim for a violation of § 1962(c), a
plaintiff must therefore allege that each defendant (i) conducted
or participated in the conduct (ii) of an enterprise (iii)

through a pattern (iv) of racketeering activity.  <u>Lum v. Bank of Am.</u>, 361 F.3d 217, 223 (3d Cir. 2004).  The defendants challenge the existence of each of these elements in these motions to dismiss.  The Court will first address the sufficiency of the allegations concerning the existence of the enterprises pled in the complaint; then the allegations concerning the defendants' participation in those enterprises; and then the allegations concerning a pattern of racketeering activity.

### 1.   <u>The Existence of an Enterprise</u>

A RICO enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  To establish the existence of an enterprise, a plaintiff must show evidence of an ongoing organization, formal or informal; evidence that the various associates of the enterprise function as a continuing unit; and evidence that the enterprise has an existence separate and apart from the pattern of activity in which it engages.  <u>United States v. Riccobene</u>, 709 F.2d 214, 221 (3d Cir. 1983) (citing <u>United States v. Turkette</u>, 452 U.S. 576, 583 (1981)).

Under the rules of notice pleading, a plaintiff need not specifically allege in her complaint the facts necessary to establish these three enterprise elements.  <u>Seville Indus. Mach.</u>

<u>Corp. v. Southmost Mach. Corp.</u>, 742 F.2d 786, 790 (3d Cir. 1984). The allegations of the complaint, however, must not affirmatively negate any of these elements, <u>id.</u> at 790 n.5, and there must be sufficient factual allegations to allow the existence of the three elements to be inferred, <u>see, e.q.</u>, <u>Lorenz v. CSX Corp.</u>, 1 F.3d 1406, 1412 (3d Cir. 1991) (plaintiffs alleging an association-in-fact between parent and subsidiary corporations "must plead facts" that, if true, would show the parent and the subsidiary to be distinct).

Here, Freedom Medical has alleged two separate enterprises:  the Count I enterprises consisting of the corporations Harbor Medical and Diversified Medical and the fictional corporation Med Logic; and the Count II enterprise consisting of an association-in-fact of all defendants.  The Court will examine the sufficiency of each of these alleged enterprises in turn.


a.   <u>Count I enterprises</u>

The elements of a RICO enterprise are met for two of the enterprises alleged in Count I:  Diversified Medical and Harbor Medical.  The allegations concerning the third entity, Med Logic, do not satisfy the pleading requirements for a RICO enterprise.

-22-

As a corporation, Diversified Medical has a distinct organizational structure and a continuing legal existence. Accordingly, at the motion to dismiss stage, absent allegations that cast doubt on the existence of these elements, "[c]ourts can reasonably assume that individuals and corporations have an organizational structure, are continuous, and have an existence separate and apart from any alleged pattern of racketeering activity." In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig., 2006 WL 1531152, at *9 (E.D. Pa. June 2, 2006).

Similarly, Harbor Medical is alleged to be a limited liability corporation. Although, as such, it lacks some of the attributes of a corporation, such as legal "personhood," it nonetheless is a state-chartered legal entity with a required organizational structure and a continuing existence. The Court can therefore reasonably assume that Harbor Medical satisfies the three elements needed to constitute an enterprise.[4]   See Bennett v. Berg, 685 F.2d 1053, 1060 n.9 (8th Cir. 1982) (enterprises that are "legal entities are garden-variety 'enterprises' which

---

[4]   The allegation that Harbor Medical "had no employees or business operations but merely served as an organizational conduit through which to engage in racketeering activities" does not negate a reasonable inference that Harbor Medical had a separate existence from the alleged pattern of racketeering activity conducted through it. Unlike an association-in-fact, a limited liability corporation has a distinct legal existence separate from the activities it performs. See Bennett, 685 F.2d at 1061.

-23-

generally pose no problem of separateness from the predicate acts.").

The third alleged enterprise in Count I, Med Logic, is not a legal entity.  It is alleged to be a fictional company, a "fabrication," created by Thomas Gillespie as a "conduit for equipment purchase opportunities diverted from Freedom Medical." Because Med Logic has no legal existence, it cannot be assumed to satisfy the elements of an enterprise.  Instead, the complaint must contain sufficient allegations to allow a reasonable inference of an organizational structure, functioning as a continuous unit, with a separate existence from its predicate acts.

Here, the complaint contains insufficient allegations as to all of these elements.  The complaint contains no allegations concerning Med Logic's structure or organization or how long it existed or who was associated with it.  The complaint also contains no allegations that would allow an inference that Med Logic had any separate existence apart from the pattern of racketeering activity.  From the allegations of the complaint, "Med Logic" appears to be no more than a fake corporate name and shipping address used by Thomas Gillespie on false invoices as part of his alleged scheme to divert Freedom Medical's equipment.

-24-

As alleged, therefore, Med Logic does not constitute a RICO enterprise.[5]

   b.   Count II enterprise

        The enterprise alleged in Count II is an association-in-fact consisting of all the named defendants.  Unlike a legal entity, an association-in-fact cannot reasonably be assumed to satisfy the elements of an enterprise and the allegations of the complaint must therefore receive greater scrutiny.  Am. Investors, 2006 WL 1531152 at *9.

        For an association-in-fact to satisfy the first element of an enterprise there must be allegations allowing an inference that "some sort of structure exists within the group for the making of decisions, whether it be hierarchical or consensual" or "some mechanism for controlling and directing the affairs of the group on an on-going rather than ad hoc basis."  Riccobene, 709

_____

        [5]    In analyzing the Count I enterprises, the Court has construed the complaint in the light most favorable to the plaintiff by interpreting Count I as alleging that Harbor Medical, Diversified Medical, and Med Logic are each separate enterprises.  As set out above, under such an interpretation, the allegations concerning two of these entities satisfy the elements for a RICO enterprise.  It is also possible to interpret Count I as alleging that Harbor Medical, Diversified Medical, and Med Logic together constitute one enterprise.  So interpreted, however, Count I would have to be dismissed for failure to adequately allege the existence of an enterprise.  The complaint contains no allegations concerning any organizational structure among the three Count I entities and no allegations that would allow a finding that such an enterprise was continuous or had a separate existence from its racketeering activities.

-25-

F.2d at 222.  Allegations that merely state that individual members of the association-in-fact performed particular roles and were aware of each other's activities are not enough to establish an organizational structure.  Am. Investors, 2006 WL 1531152 at *8.  Such allegations establish no more than a conspiracy to accomplish the underlying predicate offences and are insufficient to plead the existence of an enterprise.  Id. (citing Seville, 742 F.2d at 790 n.5).

Here, viewing the allegations of the complaint in the light most favorable to the plaintiff, the plaintiff has sufficiently pled an organizational structure for the Count II association-in-fact.  Making all reasonable inferences in plaintiff's favor, the complaint alleges a hub and spoke organization with Thomas Gillespie at its center.  Gillespie is alleged to have recruited defendants George Rivera, Greg Salario, and Cliff Hall to join with him to steal equipment and business from Freedom Medical.  To facilitate the scheme, each of these three defendants created medical equipment companies:  George Rivera incorporated American Medical, Greg Salario organized US Med-Equip, and Cliff Hall created Signature Medical and Signature Emergency.  Gillespie allegedly had ownership interests in all four of these companies.

Interpreting the allegations of the complaint, each of these corporations allegedly forms a separate secondary hub of

-26-

the alleged enterprise.  Each of these secondary hubs, in turn, allegedly involves other defendants who participate as owners, employees, or agents of the respective corporation.  Gurmit Bhatia, for example, is alleged to be an owner and control person of US Med-Equip.  Dawn Hall is alleged to be involved in the management of Signature Medical or Signature Emergency.  Other members of the alleged enterprise, such as Patrick Frayne, work with Thomas Gillespie at Freedom Medical at the hub of the enterprise.

As alleged in the complaint, the enterprise's "structure for making decisions" was top-down from Gillespie to the various subsidiary hubs.  Gillespie, who "controlled all purchases and sales of biomedical equipment" at Freedom Medical allegedly used this position to "coordinate and facilitate" the theft of equipment and business opportunities by the other defendants.  Taken as a whole, these allegations permit an inference of "an organization with a leader and a group of supervisors, each running his own operations with 'his own people,' but coordinated with the operations of other supervisors to provide greater profits and fewer conflicts." Riccobene, 709 F.2d 223.  As such, these allegations sufficiently allege an association with an ongoing organizational and decision-making structure to satisfy the first RICO enterprise element.

The Count II association-in-fact also satisfies the remaining two elements of an enterprise. The second element requires the plaintiff to show that the defendants occupied continuing positions within the group consistent with the organizational structure alleged. <u>Riccobene</u>, 709 F.2d at 223. Although the allegations of the complaint do not specifically address this issue, the structure of the alleged association-in-fact here was not fluid or undefined. The complaint alleges that during the life of the alleged scheme, Thomas Gillespie remained the head of the alleged enterprise, as did the heads of the primary subsidiary hubs, George Rivera at American Medical, Greg Salario at US Med-Equip, and Cliff Hall at Signature Medical and Signature Emergency. The continuing existence of these primary organizational elements of the alleged enterprise and the unchanging nature of their roles in the alleged scheme satisfy the second element of a RICO enterprise.

The third element requires that the plaintiff show that the enterprise has a separate existence from the alleged pattern of racketeering activities. This does not require that the enterprise have some legitimate purpose or require that it conduct activities wholly unrelated to the acts of racketeering. Instead, it requires that the enterprise have an existence beyond that necessary to commit the predicate offences. <u>Riccobene</u>, 709 F.2d at 223. Allegations that members of the enterprise

-28-

"coordinated the commission of multiple predicate offences" or provided "legitimate services during the period in which they were engaged in racketeering activities" satisfies this element. United States v. Console, 13 F.3d 641, 652 (3d Cir. 1993).

Here, the complaint alleges that Gillespie, as head of the association-in-fact, coordinated the commission of multiple predicate offences, including the theft or at least 220 pieces of medical equipment from Freedom Medical.  In addition, defendants American Medical, US Med-Equip, Signature Medical, and Signature Emergency are all alleged to be in the business of "buying, selling, renting, and servicing biomedical equipment."  As such, they may reasonably be assumed for purposes of this motion to dismiss, to be providing legitimate services as well as engaging in the alleged pattern of racketeering.  Freedom Medical has therefore pled facts sufficient to satisfy the third and final element of a RICO enterprise for the association-in-fact alleged in Count II.

### 2.   Conduct or Participation in the Enterprise

In addition to properly alleging the existence of an enterprise, a RICO plaintiff must allege that each defendant conducted or participated in the conduct of the enterprise's affairs.  Reves v. Ernst & Young, 507 U.S. 170, 185 (1990); Univ. of Md. at Balt. v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1539

(3d Cir. 1993).  In order to participate in the conduct of an enterprise's affairs, one need not hold a formal or managerial position within an enterprise.  RICO liability is not limited to upper management but extends to "lower-rung participants in the enterprise who are under the direction of upper management," as long as they "further the illegal aims of the enterprise by carrying out the directives of those in control."  <u>United States v. Urban</u>, 404 F.3d 754, 769-70 (3d Cir. 2005) (quoting <u>Reves</u> at 184).  The necessary requirement is that there be a "nexus between the person and the conduct in the affairs of an enterprise."  <u>Univ. of Md.</u> at 1539 (holding that allegations that a defendant provided valuable, indispensable accounting services to the enterprise did not adequately plead participation in the conduct of the enterprise).

> a.   <u>Count I</u>

Of the three alleged enterprises in Count I, the Court has found only Harbor Medical and Diversified Medical satisfy the pleading requirements for RICO enterprises.  Accordingly, the Court will only consider the allegations concerning the relevant defendants' participation in those two entities.

The complaint names thirteen defendants in Count I: Thomas and Lori Gillespie, Greg Salario, George Rivera, Cliff and Dawn Hall, Phillip and Patrick Frayne, Gurmit Bhatia, Signature

Medical, Signature Emergency, American Medical, and US Med-Equip.
Although all thirteen of these defendants are alleged generally
to have "conducted and participated in the conduct of each
enterprise's affairs," the Court is required to look behind these
summary allegations to the facts alleged.  See Univ. of Md.  at
1538-39.

        Of these thirteen defendants, only four are
specifically alleged to have any connection, direct or indirect,
to the affairs or business of Harbor Medical or Diversified
Medical.  Thomas Gillespie, Greg Salario, and George Rivera are
alleged to have organized Harbor Medical as a Louisiana limited
liability company in 2001.  Thomas Gillespie is alleged to have
organized Diversified Medical as a Pennsylvania corporation in
1999, and he and his wife Lori are alleged to be officers and/or
control persons of that company.  None of the other Count I
defendants is mentioned in any of the specific allegations
concerning Harbor Medical or Diversified Medical.   Having failed
to provide any facts to support the involvement of these other
defendants in the conduct or management of the two remaining
enterprises in Count I, these defendants – Cliff and Dawn Hall,
Phillip and Patrick Frayne, Gurmit Bhatia, Signature Medical,

Signature Emergency, American Medical, and US Med-Equip – must be dismissed from Count I.[6]

### b. Count II

The enterprise alleged in Count II is an association-in-fact of all the named defendants.  The Court must therefore examine for each of the ten moving defendants whether the complaint contains sufficient allegations to show the required nexus between each defendant and the conduct of the enterprise.

Moving defendant Thomas Gillespie is alleged to have "coordinate[d] and facilitate[d]" the enterprise by diverting equipment and business opportunities to the other alleged members of the enterprise, in particular the defendant corporations American Medical, US Med-Equip, Signature Medical, and Signature Emergency, which would then, in turn, sell or rent the equipment and exploit the opportunities.  Moving defendants George Rivera and Greg Salario are alleged to have owned and directed American Medical and US Med-Equip, respectively, in these activities.  The

---

[6]    Although Cliff Hall, Signature Medical, and Signature Emergency have answered the complaint and have not moved to dismiss, the claims against them in Count I may still be dismissed.  See Grayson v. Mayview State Hosp., 293 F.3d 103, 111 (3d Cir. 2002) (holding courts may dismiss claims against a defendant sua sponte if the defendant has been served and the plaintiff has had an opportunity to address the grounds for dismissal).  Here, Hall, Signature Medical, and Signature Emergency have been served and the same grounds to dismiss them are those raised by the moving defendants to which the plaintiff has had a chance to respond.

allegations concerning Gillespie, Rivera, and Salario and the four corporations that they own or co-founded are therefore sufficient to show that they had "some part in directing [the] affairs" of the association-in-fact. <u>Reves</u>, 507 U.S. at 179.

There are also sufficient allegations to show a nexus between the conduct of the enterprise and moving defendants Gurmit Bhatia and Dawn Hall. Gurmit Bhatia is alleged to be one of the "owners, directors, officers, and control persons" of US Med-Equip. Dawn Hall is alleged to be "actively involved in the operations and management" of Signature Medical and Signature Emergency. Given the centrality of US Med-Equip and Signature Medical and Signature Emergency to the alleged enterprise, as conduits for the stolen equipment and business opportunities at the heart of the alleged scheme, and the closely held nature of those corporations, the Court finds these allegations of ownership and participation sufficient to show the nexus required to survive a motion to dismiss.

The allegations concerning the remaining moving defendants – Philip and Patrick Frayne and Lori Gillespie – depict them as "lower-rung participants in the enterprise" who can be properly alleged to be participating in its conduct if they "further the illegal aims of the enterprise by carrying out the directives of those in control." <u>Urban</u>, 404 F.3d at 769-70. Patrick Frayne is alleged to have worked with Thomas Gillespie at

-33-

Freedom Medical and to have directly participated in diverting equipment and business opportunities to American Medical, US Med-Equip, Signature Medical, and Signature Emergency.  These allegations are sufficient to plead his participation in the affairs of the enterprise.

The allegations concerning Phillip Frayne and Lori Gillespie are much more scant.  The only specific allegations concerning Phillip Frayne are that he was employed as an inventory technician at Freedom Medical from January 2000 to March 2005 and that non-moving defendants Jason Ragazzo, Omar Hunt, and Martin Crouch, working at the behest of non-moving defendant Cliff Hall, stole and sold Freedom Medical equipment "through" him.  The only allegation specifically concerning Lori Gillespie's participation in the association-in-fact is that she prepared false invoices sent to Freedom Medical under the fictitious company name "Med Logic" as part of the scheme in which equipment originally stolen from Freedom Medical would be re-sold back to it at inflated prices.  Although these allegations test the limits of what is required to allege participation in an enterprise, the Court finds them sufficient to adequately plead this element.

3.   <u>Pattern of Racketeering Activity</u>

To state a claim under § 1962(c) of RICO, a plaintiff must allege that the defendant conducted or participated in the conduct of the alleged enterprise's affairs "through a pattern of racketeering activity."  A "pattern of racketeering activity" is the commission within a ten year period of at least two of the predicate offences enumerated in 18 U.S.C. § 1961(1).  18 U.S.C. § 1961(5).  Freedom Medical alleges that the predicate acts constituting the pattern of racketeering in both counts of its RICO claims are mail and wire fraud, 18 U.S.C. §§ 1341 and 1343,[7] and interstate transportation and possession of stolen property, 18 U.S.C. §§ 2314 and 2315.[8]

---

[7]     In pertinent part, the mail fraud statute makes it a crime to mail or cause to be mailed something for the purpose of executing or attempting to execute any scheme or artifice to defraud.  18 U.S.C. § 1341.  In pertinent part, the wire fraud statute makes it a crime to transmit or cause to be transmitted any communication by wire in interstate commerce for the purpose of executing any scheme or artifice to defraud.  18 U.S.C. § 1343.  To constitute wire or mail fraud, the contents of the communications sent by mail or wire need not be fraudulent and the communications need not be an essential part of the fraudulent scheme.  It is only necessary that they be "incident to an essential part of the scheme."  <u>Schmuck v. United States</u>, 489 U.S. 705, 714 (1989).

[8]     In pertinent part, the federal statute against transporting stolen property makes it a crime to transport, transmit, or transfer in interstate or foreign commerce any goods, wares, merchandise, or money of more than $5,000 value, knowing the same to have been stolen, converted or taken by fraud.  18 U.S.C. § 2314.  The statute against receiving stolen property makes it a crime to receive, possess, conceal, store, sell, barter, or dispose of any goods wares, merchandise, or money of more than $5,000 value, which have crossed a State or

Allegations of wire and mail fraud must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). <u>Lum v. Bank of America</u>, 361 F.3d 217, 223 (3d Cir. 2004), That rule requires a plaintiff to plead fraud with sufficient particularity to apprise defendants of the precise misconduct with which they are charged to protect them from spurious charges of fraudulent behavior. <u>Seville</u>, 742 F.3d at 791.  Plaintiffs may satisfy this heightened standard by alleging the date, time, speaker, and content of the alleged fraudulent conduct or by any other means that injects precision and some measure of substantiation into their allegations of fraud.  <u>Id.</u>

Allegations of interstate transport of stolen property or receipt of stolen property, because they are not based in fraud, do not need to be pled with specificity.  <u>See</u> <u>Rose v. Bartle</u>, 871 F.3d  331, 362 n.53 (3d Cir. 1989).  Instead, they need only meet the standard for notice pleading.  Where, however, the allegations of interstate transport of stolen property allege that the property has been "taken by fraud," the allegations of fraud must meet the heightened requirement of Rule 9(b).  <u>Seville Indus.</u>, 742 F.2d at 792 n.7; <u>see also</u> <u>Lum</u>, 361 F.3d at 229 (where plaintiffs allege fraud as the basis for another cause of action, they must satisfy Rule 9(b)).

---

United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken.  18 U.S.C. § 2314.

-36-

In addition to properly alleging the existence of two
or more predicate acts, a plaintiff must also show that the
racketeering acts are related and that they amount to or pose a
threat of continued criminal activity.  H.J. Inc. v. Northwestern
Bell Tel. Co., 492 U.S. 229, 239-40 (1989); c.f. Marshall-Silver
Constr. Co. v. Mendel, 894 F.2d 593 (3d Cir. 1990) (affirming
dismissal of complaint for failure to adequately allege
relatedness and continuity); overruled in non-pertinent part,
Tabas v. Tabas, 47 F.3d 1280, 1293 n.17 (3d Cir. 1995).

Predicate acts are considered related if they have "the
same or similar purposes, results, participants, victims or
methods of commission, or otherwise are interrelated by
distinguishing characteristics and not isolated events."  H.J. at
240.  Predicate acts will satisfy the continuity requirement
where they evince "long-term criminal conduct" or where "it is
shown that the predicates are a regular way of conducting
defendant's ongoing legitimate business."  Tabas at 1293.


a.  Count I

As discussed above, the two properly pled Count I
enterprises are Harbor Medical and Diversified Medical, and the
four Count I defendants who have been properly pled to have been
a participant in those enterprises are Thomas Gillespie, Lori
Gillespie, George Rivera, and Greg Salario.  In considering

-37-

whether Freedom Medical has properly alleged a pattern of racketeering with respect to these enterprises and these defendants, the Court must first consider whether it has adequately alleged a connection among them.

To properly state a RICO claim under 18 U.S.C. § 1962(c), the plaintiff must not only properly allege an enterprise in which the defendant participated, and a "pattern of racketeering activity."  The plaintiff must also plead a "nexus" between the two:  "all predicate acts in a pattern must somehow be related to the enterprise."  Banks v. Wolk, 918 F.2d 418, 424 (3d Cir. 1990).  This requirement is satisfied when "'[o]ne is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affirm of the enterprise; or the predicate offences are related to the activities of that enterprise.'"  Id. (citing United States v. Provenzano, 688 F.2d 194, 200 (3d Cir. 1982)); see also United States v. Irizarry, 341 F.3d 273, 304 (3d Cir. 2003).

Freedom Medical's complaint alleges generally that the defendants have committed "hundreds, if not thousands of predicate acts of mail fraud, wire fraud, possession of stolen property and transportation of stolen property."  It also alleges that Diversified Medical and Harbor Medical were enterprises used to "engage in racketeering activities."  Freedom Medical has not,

however, adequately alleged a connection between either enterprise and a pattern of racketeering.

Freedom Medical's complaint contains no allegations connecting Diversified Medical with any specific predicate act. The Court cannot assume that any of the general allegations of unspecified acts of wire and mail fraud and possession and transportation of stolen property are connected to Diversified Medical. The complaint itself states that many of these alleged predicate acts were conducted through other entities, such as Harbor Medical and the improperly pled "enterprise" Med Logic, or through the corporate defendants US Med-Equip, American Medical, Signature Medical, and Signature Emergency.

None of the three specific predicate acts pled in Count I is alleged to have any connection with Diversified Medical, nor do any of the other specific predicate acts mentioned elsewhere in the complaint. The description of Diversified Medical in the background section of the complaint states generally that it was used in "the receipt and disposition of stolen equipment from Freedom Medical," but there are no facts alleged to support the allegation. In the absence of any specific fact or allegation to connect Diversified Medical with a particular predicate act, the required nexus between it and the alleged pattern of racketeering has not been adequately pled.

-39-

The same failing exists as to Harbor Medical.  The complaint alleges generally that Harbor Medical was used to "facilitate the fraudulent scheme of the defendants" by serving as an "organizational conduit through which to engage in racketeering activities."  With one exception, however, the complaint alleges no facts connecting any particular predicate act to Harbor Medical.  The exception is the allegation in Count I concerning MedOne's purchase of patient monitors in January 2006.

The complaint alleges in Count I that Thomas Gillespie, acting on behalf of Freedom Medical, met with representatives from MedOne in January 2006 to discuss a business proposition. Gillespie allegedly proposed that MedOne should purchase patient monitors, which Freedom Medical would then rent to customers, sharing the rental income with MedOne.  The complaint alleges that instead of following through with this plan, Gillespie without Freedom Medical's knowledge, "made telephone or email communications to MedOne that contained false representations or omissions."  These communications then allegedly induced MedOne to issue a purchase order for $28,000 to Harbor Medical for the monitors.  The complaint alleges that the address on the invoice is the former address of Greg Salario.  The complaint alleges that Gillespie represented to MedOne that this was the best price for the monitors, but that Gillespie then purchased monitors at a

-40-

much lower price from another supplier (falsely telling the
supplier that they were being purchased by Freedom Medical),
allegedly intending to have Harbor Medical sell them to MedOne at
a $1,000 per unit markup.

The complaint contains no explanation of how the
plaintiff believes this particular incident constitutes a
predicate act.  The Court will assume that this is an attempt to
allege a predicate act of wire fraud on the part of Gillespie
(and possibly Salario) through a scheme to defraud Freedom
Medical of its opportunity to do business with MedOne involving
unspecified telephone or email communications.  This allegation
is inadequately pled because it does not allege fraud with
specificity.

Nothing in the allegation identifies the contents of
Gillespie's communications with MedOne or describes what aspect
of them was fraudulent.  Without this information, the allegation
is insufficient to put Gillespie (or Salario) on notice of the
precise misconduct with which he is charged.  In addition, the
allegation fails to specify what form these communications took,
whether telephone or email, and fails to specify that they were
made interstate, as required to be actionable under the wire
fraud statute.  Moreover, even if this allegation contained
sufficient particularity to validly allege a predicate act of
wire fraud, it would still be insufficient to allege a "pattern

-41-

of racketeering activity," which requires two or more predicate acts.

The plaintiff therefore has failed to allege a "pattern of racketeering activity" with a nexus to either of the validly pled Count I enterprises, Harbor Medical or Diversified Medical. Accordingly, Count I of the Complaint must be dismissed in its entirety.  Because Freedom Medical's failure to allege a nexus between pattern and enterprise requires dismissal of Count I, the Court will not address whether that count adequately alleges the other required elements of a RICO pattern.

b.  Count II

The RICO claim in Count II alleges an enterprise composed of an association-in-fact of all defendants.  As in Count I, Freedom Medical alleges that the pattern of racketeering connected to this enterprise involved "hundreds" of unspecified predicate acts of mail fraud, wire fraud, possession of stolen property and transportation of stolen property.

Unlike Count I, Count II adequately pleads a nexus between the alleged enterprise and at least some of the predicate acts in the alleged pattern of racketeering.  Putting aside for the moment whether the predicate acts are adequately alleged, the complaint, read in the light most favorable to the plaintiff,

sufficiently pleads a connection between those acts and the association-in-fact of the defendants.

The defendants in Count II are alleged to have committed wire and mail fraud and obtained and received stolen property through an organized racketeering association-in-fact headed by Thomas Gillespie.  Count II, therefore, alleges that all the predicate acts in the complaint were conducted through a single enterprise.  In Count I, in contrast, the predicate acts are alleged, without specificity, to have been committed both by either of the enterprises Harbor Medical and Diversified Medical and also by the fictional "enterprise" Med Logic or by the corporate defendants.  In Count I, therefore, it is impossible to connect any particular predicate act to either of the two validly pled enterprises.  In Count II, however, all of the predicate acts are alleged to have been committed through the single enterprise, allowing a connection to be inferred.  This adequately pleads a nexus between the enterprise and the alleged pattern of racketeering.

The Court next turns to examining whether Count II adequately alleges a pattern of racketeering.  As to the allegations of wire and mail fraud, the Court has concerns that they fail to satisfy the requirement of Rule 9(b) that they be plead with particularity.

-43-

The complaint contains general allegations of
"hundreds" of unspecified acts of wire and mail fraud on the part
of the defendants.  These general allegations fail to provide any
information that would inject any precision or substantiation
into Freedom Medical's claim of fraud and therefore do not
establish the existence of the predicate acts necessary for a
pattern of racketeering activity.  See Lum, 361 F.3d at 224.

The complaint also alleges several specific acts of
fraud.  These allegations refer to particular transactions
involving specifically identified pieces of equipment and allege
that Gillespie either diverted equipment or a business
opportunity belonging to Freedom Medical to himself or one of the
other defendants.[9]  While these specific allegations do inject a

---

[9]    The specific allegations of fraud are scattered
throughout the complaint.  In addition to the allegation
concerning Harbor Medical's sale of patient monitors to MedOne,
discussed in reference to Count I, there are at least four
others.  The background section of the complaint alleges that in
early 2006 Thomas Gillespie fraudulently diverted two IV pumps
from an order of 40 that Freedom Medical had purchased from
Goldstar Medical, falsely telling both Goldstar and Freedom
Medical that the two pumps were never delivered.  The complaint
alleges that on another occasion Gillespie declined to purchase
Baxter PCA II pumps offered for sale by American Imaging Systems
and instead diverted that business to Signature Medical, which
purchased them and had them shipped to Gillespie's home address.
The pumps were then sold by Gillespie to Freedom Medical through
the fictional entity Med Logic.  Elsewhere in the complaint,
Gillespie is alleged to have sold numerous pieces of equipment in
2005 to Freedom Medical through Med Logic at inflated prices.  In
these sales, Gillespie allegedly received the check payable to
Med Logic personally and often deposited the check in American
Medical' bank accounts.  In August 2005, Gillespie allegedly
diverted six Baxter I pumps that Freedom Medical purchased from

-44-

measure of precision and substantiation to the plaintiff's claims, they often omit important information about the individual incidents. Several specific allegations of fraud fail to indicate with precision the exact misrepresentation that is alleged to have been made and to whom. See Lum at 224 (to satisfy Rule 9(b), plaintiffs must allege the "general content of the misrepresentation"). Several also fail to identify any particular wire or mail communication associated or connected to the alleged fraud, and in the case of wire communications whether they were made interstate. See Am. Investors, 2006 WL 1531152 at *11 ("plaintiffs must allege sufficient facts . . . from which one can infer that the defendant used the mails or interstate wires as part of a scheme to defraud, or took some action where such use of the mails or interstate wires was reasonably foreseeable").

        The Court therefore does not believe that all of these specific allegations of wire and mail fraud satisfy Rule 9(b), but it may be that some of them do. The Court, however, need not decide this issue because the other predicate acts alleged in Count II, the allegations of the interstate transport and receipt

---

Goldstar Medical, paying for the pumps from an account drawn on American Medical's account, but sending the pumps to US Med-Equip. One of these pumps later proved defective and Gillespie allegedly directed Pat Frayne to prepare a requisition form to allow Freedom Medical to purchase the defective unit at an inflated price.

of stolen property, are sufficient to establish the requisite pattern of racketeering activity.

Unlike acts of mail and wire fraud, predicate acts of transporting and receiving stolen property across state lines do not always need to be pled with specificity.  Only where the property at issue was taken by fraud, as opposed to theft, must a plaintiff plead with particularity, and even then the requirement of particularity applies only to the facts relating to the fraud, not to the other elements of the violation.  Seville, 742 F.2d at 792 n.7; Lum, 361 F.3d at 229.

The United States Court of Appeals for the Third Circuit considered the level of detail necessary for pleading these predicate acts in a RICO claim in Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d at 791-92.  In Seville, the plaintiff alleged that the defendants had violated 18 U.S.C. §§ 2314 and 2315 by, inter alia, inducing the plaintiff to sell equipment to the defendants that was never paid for.  The Seville court held that the plaintiff had met its pleading obligations by incorporating into their complaint a list identifying with specificity the pieces of machinery that were alleged to have been taken by fraud.  The court held that the plaintiff had adequately alleged the required element that the property taken be worth more than $5,000 by alleging the total value of the machinery taken to be more than $750,000 and had

-46-

adequately alleged the property had been transported or sold over interstate lines by general allegations to that effect.  Id. at 791-92.[10]

    Following the holding of Seville Indus., the Court finds that Freedom Medical has adequately alleged predicate acts consisting of violations of 18 U.S.C. §§ 2314 and 2315.  Although Freedom Medical did not incorporate a list of stolen equipment in its complaint, the Court takes judicial notice of the fact that it filed such a list of record as an exhibit to its motion for temporary restraining order, filed shortly after the filing of its complaint.  See Exh. 9 to Plaintiff's Motion for Temporary

---

[10]    The alleged pattern of racketeering activity in Seville Indus., like this case, involved allegations of mail and wire fraud, as well as allegations of interstate theft.  The Seville court held that the list of stolen equipment incorporated into the plaintiff's complaint sufficed to satisfy both the requirements for pleading interstate theft and the heightened requirement for pleading wire and mail fraud with particularity.  Id., 742 F.2d at 791.  The United States Court of Appeals for the Third Circuit most recently revisited the particularity needed to plead a predicate act of wire or mail fraud in Lum, 361 F.3d 217.  The Lum court reemphasized the need to identify with specificity "who made a misrepresentation to whom and the general content of the misrepresentation." Id. at 224.  Lum cited Seville several times in its analysis, but described the case as holding "that a plaintiff satisfied Rule 9(b) by pleading which machines were the subject of alleged fraudulent transactions and the nature and subject of the alleged misrepresentations." Id.  Although, as discussed below, this case and Seville both involve lists of property that was allegedly obtained through fraud, the Court does not believe that Seville necessarily saves Freedom Medical's wire and mail fraud claims.  As set out above, the Court finds, unlike Seville, that the allegations of this complaint may not adequately set out the "nature and subject of the alleged misrepresentations."  Seville is therefore distinguishable.

Restraining Order (Docket No. 30).  This list provides the serial number and description of each piece of equipment at issue.  The complaint also ascribes a specific quantity of stolen pieces of equipment to individual defendants.  Without identifying the particular pieces of equipment, the complaint alleges that American Medical has stolen 24 items, US Med-Equip 70 items, and Signature Medical 148 items.  As in Seville Indus., the value of this equipment is alleged in aggregate, with the total amount of these 242 pieces of equipment alleged to be approximately $400,000.  The complaint also makes general allegations that these thefts occurred in interstate commerce.  Under Seville Indus., this is sufficient to allege these predicate acts.[11]

The final requirement for pleading a pattern of racketeering is properly alleging that the predicate acts are related and that they amount to or pose a threat of continued criminal activity.  H.J. Inc., 492 U.S. at 239-40.  Here, the alleged predicate acts of theft involve the same alleged victim,

_____

[11]     It is a closer question whether Freedom Medical has adequately pled a connection between the alleged pattern of interstate transport and receipt of stolen property and each of the named defendants.  The Seville court upholds a RICO claim in which the plaintiff only pleads generally that "defendants" committed the alleged predicate acts with respect to the listed pieces of equipment.  Given the precedent of Seville and the fact that the predicate acts here of interstate transport and receipt of stolen property need not be pled with specificity, the Court finds that the plaintiffs have sufficiently alleged a connection between the defendants and the pattern of racketeering to survive a motion to dismiss.

-48-

Freedom Medical, the same alleged ring-leader, Thomas Gillespie, and the same alleged method, utilizing Gillespie's position at Freedom Medical to divert property and business opportunities. The alleged pattern therefore is "interrelated by distinguishing characteristics" and not a series of isolated events, and so satisfies the requirement of relatedness. Id. at 240.

The alleged pattern also satisfies the requirement that it amount to or pose a threat of continued criminal activity. Where the plaintiff alleges that the racketeering activity at issue has ceased and the alleged scheme is therefore closed-ended, the plaintiff will adequately show this element by proving a series of related predicate acts extending over a substantial period of time.  Id. at 242.  Here, Freedom Medical's complaint pleads a closed-ended pattern consisting of allegedly hundred of acts of theft beginning no later than October 2001 and continuing until Freedom says it discovered the alleged scheme in April 2006.  This four and a half year long scheme adequately alleges that the alleged pattern of racketeering presented a continuous threat.  See Tabas, 47 F.3d at 1295 ("[A] scheme lasting over three years extends over a 'substantial' period of time and therefore constitutes the type of 'long-term criminal conduct that RICO was enacted to address.").

Freedom Medical having adequately alleged the necessary elements of a RICO claim with respect to the predicate acts of

theft in violation of 18 U.S.C. §§ 2314 and 2315, the defendants'
motions to dismiss will be denied as to Count II.

      B.    <u>The RICO conspiracy claim – Count III</u>

      Count III of the complaint alleges that all of the
named defendants conspired to conduct or participate in the
affairs of the association-in-fact enterprise alleged in Count
II, through the pattern of racketeering activities named in the
complaint.  None of the moving defendants specifically addresses
Count III, although all seek to have it dismissed as to them,
along with the other substantive RICO claims.

      To state a RICO conspiracy claim under section 1962(d),
a plaintiff must allege (i) an agreement to commit the alleged
predicate acts, and (ii) knowledge that those acts were part of a
pattern of racketeering activity conducted in such a way as to
violate section 1962(a), (b), or (c).  <u>Rose</u>, 871 F.2d at 366.  A
section 1962(d) claim cannot be pursued where there is no
cognizable RICO enterprise or pattern of racketeering activity
alleged by the defendant or co-conspirators.  <u>See</u> <u>Lum</u>, 361 F.3d
at 227 n.5 ("Any claim under section 1962(d) based on conspiracy
to violate the other subsections of section 1962 must fail if the
substantive claims are themselves deficient.").

      Here, the Court has found that Count II of the
complaint, on which Count III is based, states a valid claim as

to the predicate acts of interstate transport and receipt of stolen property in violation of 18 U.S.C. §§ 2314 and 2315. Accordingly, in the absence of any argument by the moving defendants specifically addressing Count III, the Court will deny the defendant's motion to dismiss as to that count.

      C.   <u>The State Law Claims</u>

In addition to the challenge to the RICO claims made by all moving defendants, certain defendants also challenge some of the state law claims alleged in the complaint. The moving defendants all assume that Pennsylvania law will govern the state law claims of the complaint. For purposes of this motion, the Court will accept that assumption.

      1.   <u>Fraud</u>

All of the moving defendants except Thomas Gillespie challenge the adequacy of the complaint's allegations against them of common law fraud (Count IV). In Pennsylvania, an action for fraud (or intentional misrepresentation) contains the following elements: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or with recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6)

injury resulting and proximately caused by the reliance.  <u>Gibbs</u>
<u>v. Ernst</u>, 647 A.2d 882 (Pa. 1994).  A misrepresentation need not
be in the form of a positive assertion, but can be "any artifice
by which a person is deceived to his disadvantage and may be by
false or misleading allegations or by concealment of that which
should have been disclosed, which deceives or is intended to
deceive another to act upon it to his detriment."  <u>Delahanty v.</u>
<u>First Pennsylvania Bank, N.A.,</u> 464 A.2d 1243, 1252 (Pa. Super.
Ct. 1983).  Like other claims alleging fraud, state common law
fraud claims must comply with Rule 9(b) and be pled with
particularity.  <u>Christidis v. First Pa. Mortgage Trust</u>, 717 F.2d
96, 99 (3d Cir. 1983).

     Count IV of the complaint alleges nine specific acts of
fraud on the part of the defendants:

> a     At all relevant times, the individual
> was in compliance with the terms of the
> applicable Non-Compete Agreement,
> Employment Agreement, and/or Executive
> Employment Agreement;
>
> b     The individual or entity would not steal
> equipment from Freedom Medical or
> withhold material information about
> criminal conduct of which the individual
> or entity was aware from Freedom Medical
> or proper law enforcement authorities;
>
> c     If involved, directly or indirectly, in
> the sale of equipment to Freedom
> Medical, the seller had valid title to
> the equipment to be sold, and that the
> equipment was in good working order;

-52-

d     If involved, directly or indirectly, in the purchase of equipment from Freedom Medical, that the purchase was a bon[a] fide transaction for fair value free of any conflict of interest;

e     Failing to disclose that numerous sales and proposed sales of equipment to Freedom Medical by Med Logic, Signature Medical, U.S. Med-Equip, and other persons, were at grossly inflated prices and part of defendants' schemes to defraud Freedom Medical;

f     Failing to disclose that certain of the defendants, including Tom Gillespie, Greg Salario, George Rivera, Jason Ragazzo, Rick Burgess, Martin Crouch, Omar Hunt, Jasper Smith, and Joseph Janssens, had significant financial interest and/or business dealings with one or more of Harbor Medical, Med Logic, Signature Medical, Signature EP, American Medical Logistics, U.S. Med-Equip, Complete Biomedical and/or Biomedix Medical;

g     If involved, directly or indirectly, in the sale of equipment to Freedom Medical that the sale price was comparable to that available from other sellers of such equipment and was the result of arm's length negotiations with independent third parties;

h     Failing to disclose that the individual was misappropriating business opportunities of Freedom Medical for the personal benefit, directly or indirectly, of the individual and/or affiliates of the individual; and

i     At all relevant times, the individual was in compliance with the applicable policies in the Company's employee handbook.

-53-

None of these allegations adequately alleges fraud with particularity against any of the moving defendants.  These conclusory allegations do not "indicate the date, time, or place of any misrepresentation, nor do they provide an alternative means of injecting precision and some measure of substantiation into the fraud allegations."  Lum, 361 F.3d at 224.  Indeed, none of these allegations refers to any specific communication or transaction by any defendant.  These pleadings are therefore insufficient to satisfy Rule 9(b) and must be dismissed as to the moving defendants.

### 2    Misappropriation of Trade Secrets and Breach of Fiduciary Duty

Defendant Thomas Gillespie argues that the complaint's misappropriation and breach of fiduciary duty claims against him are barred by gist of the action doctrine.  Defendant Greg Salario argues that the complaint's allegations regarding these two causes of action fail to state a claim because the complaint does not properly allege the existence of a trade secret or a fiduciary duty.  The Court will deny these defendants' motions to dismiss as to these claims.

The gist of the action doctrine "precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims."  eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 13 (Pa. Super. Ct. 2002).  The focus of the doctrine is on

the source of the duty that a defendant is alleged to have breached:  "a claim should be limited to a contract claim when 'the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied by the law of torts.'"  Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 104 (3rd Cir. 2001) (citing Bash v. Bell Tel. Co., 601 A.2d 825, 830 (Pa. Super. Ct. 1992).

Gillespie argues that the claims against him for misappropriation of trade secrets and breach of fiduciary duty must be dismissed under the gist of the action doctrine because his duty to refrain from misappropriating trade secrets or breaching his duty to his employer arises only from his now-terminated employment contract with Freedom Medical. Pennsylvania law, however, imposes a common law duty on an employee not to use or disclose trade secrets obtained in the course of a confidential employment relationship.  Christopher M's Hand Poured Fudge, Inc. v. Hennon, 699 A.2d 1272, 1276 (Pa. Super. Ct. 1997).  A confidential relationship will also give rise to fiduciary duties under Pennsylvania law.  Basile v. H & R Block, Inc., 777 A.2d 95, 101-02 (Pa. Super. Ct. 2001) ("[A] confidential relationship and the resulting fiduciary duty may attach wherever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest.").

Here, the complaint alleges that Gillespie occupied a "trusted, central role in Freedom Medical's affairs."  Viewed under the standards for deciding a motion to dismiss, these allegations adequately plead that Gillespie had a confidential relationship with Freedom Medical, which could, depending on the facts ultimately proved, give rise to independent duties to refrain from disclosing or misappropriating trade secrets or from breaching a fiduciary duty.  Accordingly, Freedom Medical's claims for misappropriation of trade secrets and breach of fiduciary duty cannot be dismissed against Gillespie at this time under the gist of the action doctrine.

Greg Salario's argument for dismissing these claims also fails.  Salario argues that he (and his company US Med-Equip) cannot be liable for misappropriation of Freedom Medical's trade secrets, specifically its customer lists, because Freedom Medical has not properly alleged that these lists were secret. He argues that he cannot be liable for breach of fiduciary duty because Freedom Medical has not adequately alleged that his position as a sales supervisor was sufficiently confidential to give rise to such duties.

This argument misunderstands the plaintiff's pleading burden.  Neither misappropriation of trade secrets or breach of fiduciary duties require a showing of fraud and so neither must be pled with particularity.  See Pestco, Inc. v. Associated

Products, Inc. , 880 A.2d 700, 705  (Pa. Super. Ct. 2003)
(setting out elements of misappropriation of trade secret claim
under Pennsylvania law); McDermott v. Party City Corp., 11 F.
Supp.2d 612, 626 n.18 (E.D. Pa. 1998) (setting out elements for
breach of fiduciary duty under Pennsylvania law).  Although
Freedom Medical may eventually have to prove facts establishing
that it had a confidential relationship with Salario giving rise
to a fiduciary duty and that its proprietary information was
sufficiently confidential to constitute a trade secret, it does
not need to plead those fact in its complaint.  Freedom Medical's
complaint has given Salario (and US Med-Equip) adequate notice of
the misappropriation and breach of fiduciary claims against them.
This is all that is required under the Federal Rules of Civil
Procedure.

### 3.   Conspiracy

Defendants Salario, Gurmit Bhatia and US Med-Equip have
moved to dismiss the claims against them for conspiracy.  These
defendants argue that although Freedom Medical alleges that
defendants Gillespie, Rivera, and Salario conspired to engage in
a pattern of racketeering, and that the other defendants,
including Bhatia and US Med-Equip, later joined this conspiracy
to steal Freedom Medical's biomedical equipment and business
opportunities, these allegations are insufficient to state a

claim.  The Court disagrees.  As set out above in the section addressing the adequacy of the association-in-fact enterprise alleged in Count II, the complaint contains sufficient allegations to "describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in that conspiracy."  <u>Rose</u>, 871 F.2d at 366.  This is sufficient to state a claim.

4.  <u>Conversion</u>

Defendants Salario, Gurmit Bhatia and US Med-Equip have moved to dismiss the claims of conversion against them.  They argue that, although Freedom Medical alleges that all of the defendants participated directly or indirectly in the theft or diversion of certain assets, these allegations fail to state a claim because they do not allege "what assets were stolen and by whom; and what assets were diverted and by whom."  The Court again disagrees.  A claim for conversion does not require a showing of fraud or mistake and so does not need to be plead with particularity.  <u>See</u> <u>Universal Premium Acceptance Corp. v. York Bank & Trust Co.</u>, 69 F.3d 695, 704 (3d Cir. 1995) (setting out elements of common law conversion under Pennsylvania law).  The allegations of the complaint give sufficient detail to satisfy the requirements of notice pleading and state a claim for conversion.

5.   <u>Breach of Contract</u>

Defendant Greg Salario argues that the claim against him for breach of his employment agreement with Freedom Medical should be dismissed because 1) the confidentiality and non-compete provisions of that contract have expired and 2) because the non-compete agreement is not enforceable.  The Court will deny Salario's motion to dismiss as to this claim.

The complaint alleges that Salario signed two agreements with Freedom Medical, an employment agreement and a non-competition agreement.  The employment agreement provided that Salario was not to disclose the company's confidential or proprietary information and also that he was not to compete with the company for a period of one year after his termination within a specified area and was not to solicit any current or prospective client of the company.  The separate non-competition agreement provided that Salario was not to disclose confidential or proprietary information; was not to make use of such information except to fulfill his duties to Freedom Medical; was not to serve as an employee, owner, director or independent contractor for any competing business; and was not, within a specified area for a period of one year after his termination, to compete with Freedom Medical.

Salario argues that because the one year non-competition terms of both contracts expired as of August 2004, Freedom Medical cannot "now enforce the terms of [those] agreements" and has failed "to establish any facts" showing that Salario breached them.  This argument is misplaced.  Freedom Medical's complaint specifically alleges that Salario organized his competing company, US Med-Equip, in June 2003 while still employed at Freedom Medical.  The complaint also specifically alleges that Salario violated the confidentiality provisions of the agreement.  These allegations therefore state a claim for breach of contract.

Salario also argues that the non-competition agreement is unenforceable because it was not supported by consideration. Salario notes that the complaint alleges that the consideration for the non-competition agreement was participation in the "Freedom Medical Equity Participation Plan," but he alleges that the plan was an "empty promise" and he never participated in it. Whether Salario received consideration for his assent to the non-competition agreement is an issue of fact that cannot be resolved on a motion to dismiss.  Salario's motion will therefore be denied as to the breach of contract claim.

D     Arguments of Gurmit Bhatia and Dawn Hall

Defendants Gurmit Bhatia and Dawn Hall raise individual issues distinct from those raised by the other moving defendants. Bhatia moves for dismissal of all claims against him under Fed. R. Civ. P. 12(b)(2), alleging that there is no personal jurisdiction over him in this Court.  Dawn Hall moves for dismissal of all claims against her because the complaint does not adequately allege she participated in any of the events set out in the complaint and that she has been named as a defendant only on the basis that she is the spouse of non-moving defendant Cliff Hall.  In addition, Hall moves to strike a supplemental brief that the plaintiff filed in opposition to her motion.  The Court will rule against Bhatia and Hall on these arguments.

Bhatia, a resident of Texas, alleges that he lacks the minimum contacts with Pennsylvania necessary to be subject to jurisdiction in this district.  Once a defendant raises the issue of personal jurisdiction in a motion to dismiss, a plaintiff is required to present a prima facie case that jurisdiction exists. Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93 (3d Cir. 2004).

Here, neither party has presented evidence in support of its position on jurisdiction.  Bhatia asserted lack of jurisdiction in his motion, but presented no supporting affidavit.  Bhatia also conceded in his motion that jurisdiction over him could be asserted through RICO's provision allowing for

-61-

nationwide service of process, but contended that the plaintiff

had failed to allege a viable RICO claim against him.[12]   In

---

[12]    Because Bhatia's concedes that he can be subject to
personal jurisdiction in this Court under RICO's provision
allowing for nationwide service of process, the Court need not
address the specific statutory provisions authorizing such
service.   Those federal circuit courts to address the issue have
disagreed over which provision of 18 U.S.C. § 1965 authorizes
nationwide service of process.   The United States Courts of
Appeals for the Second, Seventh, Ninth and Tenth Circuits have
held it authorized by § 1965(b), which authorizes nationwide
service when "the ends of justice require that other parties
residing in any other district be brought before the court."
Cory v. Aztec Steel Bldg., Inc., 468 F.3d 1226, 1229 (10th Cir.
2006); PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65,
71-72 (2d Cir. 1998) Lisak v. Mercantile Bancorp., Inc., 834 F.2d
668, 671 (7th Cir. 1987); Butcher's Union Local No. 498 v. SDC
Inv., Inc., 788 F.2d 535, 538 (9th Cir. 1986).   The U.S. Courts
of Appeals for the Fourth and Eleventh Circuits have held it
authorized by § 1965(d) which allows "[a]ll other process" in a
RICO action to be served in "any judicial district in which such
person resides, is found, has an agent or transacts his affairs."
Republic of Panama v. BCCI Holdings (Lux.) S.A., 119 F.3d 935,
942 (11th Cir. 1997); ESAB Group, Inc. v. Centricut, Inc., 126
F.3d 617, 627 (4th Cir. 1997).   The practical distinction between
these two interpretations appears to be whether nationwide
service of process is authorized in all instances or only when
"the ends of justice require."   The United States Court of
Appeals for the Third Circuit has not addressed the issue.

       Even had Bhatia not conceded that he was subject to
RICO's nationwide service of process, the Court would not need to
address which subsection of § 1965 applies here because service
of process would be authorized under either statutory
interpretation.   Because Bhatia, alone among the twenty-three
defendants, may not have sufficient contacts with Pennsylvania to
be subject to jurisdiction in this district without resort to
RICO's service of process provisions, the ends of justice
authorize the exercise of nationwide service of process to ensure
that all defendants allegedly liable for the claimed RICO
violations against Freedom Medical can be brought before one
court.   See Cory at 1232 (nationwide service of process should
not be withheld when it will allow all RICO defendants "to be
haled into one court for a single trial"); Butcher's Union at 539
("Congress intended the 'ends of justice' provision to enable

response, Freedom Medical's opposition did not directly address Bhatia's argument on jurisdiction, but instead argued at length that it had validly stated a RICO claim against him.

Having found, as set out at length above, that Freedom Medical has stated a claim against Bhatia under RICO, the Court finds that Freedom Medical has made out a prima facie case for jurisdiction over Bhatia in this Court.

Dawn Hall argues that Freedom Medical has failed to adequately allege that she participated in any of the allegedly wrongful activities set out in its complaint. She points out that she is only mentioned by name in six of the 155 paragraphs of Freedom Medical's complaint and otherwise is included only in general references to "defendants."

As set out above, the Court has found that, although minimal, Freedom Medical's allegations that Dawn Hall was "actively involved in the operations and management" of Signature Medical and Signature Emergency sufficiently allege her participation in the enterprise alleged in Count II to state a RICO claim. Hall therefore cannot be dismissed from the RICO claim in Count II or the RICO conspiracy claim in Count III. For the reasons set out elsewhere above, however, Hall will be

---

plaintiffs to bring all members of a nationwide RICO conspiracy before a court in a single trial."). Bhatia has made no argument, much less a showing, that litigation in Pennsylvania will cause him undue hardship.

dismissed from the RICO claim in Count I, which is being
dismissed as to all defendants named in it, and from the fraud
claim in Count IV, which is being dismissed as to all moving
defendants on that claim.

As to the remaining claims, Dawn Hall is not named as a
defendant in Freedom Medical's breach of fiduciary duty or breach
of contract claims in Counts V and IX, respectively, but is named
as a defendant in the claims for misappropriation of trade
secrets (Count VI), civil conspiracy (Count VII), and conversion
(Count VIII).  As to these three latter claims, the Court finds
that Freedom Medical has adequately stated them with respect to
Dawn Hall.  As set out above in reference to the arguments of
Salario, Bhatia, and US Med-Equip on these claims, none of these
claims is based on fraud.  Freedom Medical's allegations as to
these claims, therefore, need only satisfy the requirements of
notice pleading and need not specifically allege supporting
facts.

Dawn Hall has also moved to strike Freedom Medical's
supplemental brief in opposition to her motion to dismiss.  This
brief was filed outside the time provided in Local Rule 7.1(c)
for filing an opposition to a motion and without seeking the
permission of the Court.  The brief relied on material outside
the plaintiff's complaint, specifically deposition testimony from
Fred Howland, an employee of Signature Emergency, concerning the

extent of Hall's involvement in that company.  The Court has not relied on any of the assertions, evidence or arguments in the supplemental brief in deciding Hall's motion to dismiss.  The Court will therefore deny the motion to strike as moot.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FREEDOM MEDICAL INC.              :      CIVIL ACTION
                                  :
                    v.            :
                                  :
THOMAS R. GILLESPIE, III,         :
et al.                            :      NO. 06-3195

ORDER

AND NOW, this 29th day of August, 2007, upon
consideration of the following motions:

A    the Motion to Dismiss of Defendant Dawn Hall (Docket #
     26);

B    the Motion to Dismiss of Defendants Gurmit Bhatia, U.S.
     Med-Equip, Inc., and Greg Salario (Docket # 94);

C    the Motion to Dismiss of Defendants Thomas R.
     Gillespie, III, Phillip Frayne, Patrick Frayne and Lori
     Gillespie (Docket # 96/97);

D    the Motion to Dismiss of Defendants George Rivera and
     American Medical Logistics, LLC (Docket # 114); and

E    the Motion of Defendant Dawn Hall to Strike Plaintiff's
     Supplemental Brief in Support of its Opposition to Dawn
     Hall's Motion to Dismiss (Docket # 223),

and after consideration of any responses and replies thereto, IT
IS HEREBY ORDERED, for the reasons stated in the accompanying

memorandum that:

1    The Motions to Dismiss are GRANTED IN PART as follows:

    a    Count I (RICO) of the complaint is dismissed in its entirety as to all defendants;

    b    Count IV (Fraud) of the complaint is dismissed as to the following moving defendants:  Dawn Hall, Gurmit Bhatia, U.S. Med-Equip, Inc., Greg Salario, Phillip Frayne, Patrick Frayne, Lori Gillespie, George Rivera and American Medical Logistics, LLC;

2    The Motions to Dismiss are DENIED as to all other claims.

3    Defendant Dawn Hall's Motion to Strike Plaintiff's Supplemental Brief is DENIED AS MOOT.


BY THE COURT:


/s/ Mary A. McLaughlin
MARY A. McLAUGHLIN, J.

-2-