IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


FREEDOM MEDICAL, INC.         :      CIVIL ACTION
                              :
            v.                :
                              :
THOMAS R. GILLESPIE, III,     :
et al.                        :      NO. 06-3195


MEMORANDUM

McLaughlin, J.                                        May 23, 2013

        Plaintiff Freedom Medical, Inc. ("Freedom Medical") is
in the business of purchasing and refurbishing medical equipment
and then reselling, renting, and servicing it.  In this suit,
Freedom Medical alleges that a number of former employees, along
with several companies controlled by them and various associated
individuals, combined together to steal Freedom Medical's
inventory and business opportunities in violation of the
Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18
U.S.C. § 1961, et seq.  Freedom Medical also brings a number of
state law claims against different configurations of defendants.
The original complaint in this action named seventeen individual
defendants and six corporate defendants.  Currently, eleven
defendants remain.

        In two separate motions, four of the remaining
defendants here move for summary judgment on all claims.  One
motion for summary judgment is filed by U.S. Med-Equip, Inc.
("U.S. Med"), Gurmit Bhatia, and Gregory Salario (collectively,

the "U.S. Med Defendants").  The other motion is filed by Sandra "Dawn" Hall.[1]  The Court held oral argument on the defendants' motions on March 14, 2013.

The Court will grant summary judgment in favor of all of the moving defendants on Freedom Medical's RICO claims and in favor of Ms. Hall on all state law claims against her.  The Court will, however, deny the U.S. Med Defendants' motion for summary judgment on the state law claims against them.

I.   Summary Judgment Record[2]

The facts described herein are undisputed unless

_____

[1] The other defendants remaining in this suit are Martin Crouch, Omar Hunt, Signature Medical Ltd., LLC, Signature Emergency Products, LLC, Rick Burgess, Jasper Smith, and Clifford Hall.  Default was entered against Crouch and Hunt in August 2008, and against the two Signature entities in September 2012. Default has not been entered against Burgess or Smith, but they have taken no action in this case since 2006.

[2] In responding to the moving defendants' motions for summary judgment, Freedom Medical many times relies on the allegations of its second amended complaint.  A plaintiff cannot rest on the averments in its complaint to defeat a defendant's motion for summary judgment and instead must establish by affidavit or other evidence specific facts showing a genuine issue for trial.  Fed. R. Civ. P. 56(c)(1); Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  For that reason, the Court has not considered assertions, supported only by allegations in the second amended complaint, as part of its factual record.  The Court also reiterates that, pursuant to Federal Rule of Civil Procedure 56(e) and its individual protocol, aside from a few background facts about the parties proffered by the U.S. Med Defendants and expressly admitted by Freedom Medical, it also has not considered either oral or written factual representations that are not supported by citations to the evidentiary record.

otherwise noted.  Inferences are drawn in the light most favorable to Freedom Medical, the non-moving party.  Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009).

A.   Relevant Parties

The plaintiff, Freedom Medical, is a Pennsylvania corporation operated by Frank Gwynn and Dominic Greco.  It was founded in 1997 and engages in the business of buying, renting, and selling biomedical equipment.  U.S. Med Def'ts' Undisputed Stmt. ¶¶ 2-3.

Moving defendant U.S. Med is a Texas corporation that also buys, sells, rents, and services biomedical equipment.  It is the successor to Techmate, Inc. ("Techmate"), a Texas entity started by moving defendant Gurmit Bhatia.  Today, U.S. Med is wholly owned by Bhatia and moving defendant Gregory Salario, a former Freedom Medical employee.  Id. ¶¶ 1, 4.

Moving defendant Sandra "Dawn" Hall is married to non-moving defendant Clifford Hall, who also once worked for Freedom Medical.[3]  The couple was married in 1997, prior to Mr. Hall's employment at Freedom Medical.  PX-H 1 (8/20/12 C. Hall Dep.) at

---

[3] To avoid confusion, the Court will refer to the Halls as "Mr. Hall" and "Ms. Hall."

69; PX-H 2 (11/16/10 Gillespie Aff.) ¶ 3.[4]


B.  Salario's Employment with Freedom Medical

Salario began working as a salesman at Freedom Medical
in August 1999.  Within a few years, he had advanced to the
position of vice president of sales for the region covering Texas
and the states east of the Mississippi.  PX-USM 5 (11/11/08
Salario Dep.) at 17-18; PX-USM 1 (8/12/99 Employment Agmt.).

When he was hired, Salario signed an engagement letter
outlining the terms of his employment.  The letter agreement
stated that Salario would not disclose or divulge Freedom
Medical's confidential information, either during or after the
term of his employment.  The agreement also precluded Salario
from soliciting any of Freedom Medical's customers or employees
for a period of one year following termination of his employment.
PX-USM 1.

In August 2001, Salario entered into a further "Non-
Disclosure, Non-Compete, and Property Rights Agreement" with
Freedom Medical.  That subsequent agreement contained terms
similar to, though more detailed than, Salario's original

_____

[4] "PX-H" refers to the exhibits submitted by Freedom Medical
along with its opposition to Ms. Hall's motion for summary
judgment, and "PX-USM" refers to the exhibits it submitted along
with its opposition to the U.S. Med Defendants' summary judgment
motion.  "USMX" refers to the exhibits submitted by the U.S. Med
Defendants in support of their motion.

employment agreement.  The contract reiterated that Salario was prohibited from ever disclosing any of Freedom Medical's confidential information, including information relating to its sales and the identity of its customers.  For a one-year period after Salario's employment with Freedom Medical ended, he also could not "solicit, induce, divert, employ, engage or otherwise interfere with any of Freedom Medical's employees or consultants."  PX-USM 2 (8/28/01 Non-Disclosure, Non-Compete, and Property Rights Agmt.) §§ 1-2.

The 2001 agreement further barred Salario, for the same one-year period, from engaging in or soliciting business "similar to, in competition with or the same as the Business of Freedom Medical."  The agreement provided the following definition of "Business of Freedom Medical":

> all businesses of Freedom Medical and its affiliates, whether presently conducted or hereafter engaged in or contemplated by Freedom Medical or any affiliate at any time during the term of [Salario's] engagement involving the research, development, engineering, integration, manufacture, production, purchasing, leasing, and/or selling of emergency medical equipment and supplies, such as (without limitation) defibrillators, patient monitors, infusion therapy devices, and other emergency medical equipment and supplies, and related concepts, plans, or processes.

The agreement set a geographic limitation on this restriction; it applied only to an area within 75 miles of any Freedom Medical office where Salario had worked.  By handwritten amendment, the State of Louisiana was exempted from the 75-mile geographic

limitation.  <u>Id.</u> § 2.1.


      C.    <u>Outside Business Ventures of Freedom Medical Employees</u>

        Several Freedom Medical employees, who also are or were named defendants in this action, created their own business entities within the medical equipment field, both during and after their employment with Freedom Medical.


      1.    <u>Harbor Medical, LLC</u>

        In 2001, while working at Freedom Medical, Salario and two other Freedom Medical employees, George Rivera and Thomas Gillespie, formed their own company, Harbor Medical, LLC, to engage in medical equipment transactions.[5]  At the time, Gillespie was vice president of marketing and sales for the company, working out of Freedom Medical's corporate headquarters in Exton, Pennsylvania.  Rivera was the manager of the New York metropolitan area branch.  PX-H 2 ¶¶ 12, 14; PX-USM 12 (10/3/11 Janssens Aff.) ¶ 6; PX-USM 18 (12/12/12 Gwynn Aff.) ¶ 4.  Harbor Medical engaged in three medical equipment transactions: one in each of 2001, 2002, and 2006.  PX-USM 3 (Purchase Orders).

_____

    [5] Gillespie and Rivera are both former defendants in this suit.  Rivera was voluntarily dismissed on March 25, 2010, and, pursuant to a stipulation by the parties, the Court dismissed Gillespie on December 2, 2010.  Docket No. 495 (3/25/10 Notice of Voluntary Dismissal); Docket No. 506 (12/2/10 Stip. & Order of Dismissal).

2.  U.S. Med

    a.  Formation of U.S. Med

Through his work at Freedom Medical, Salario met
Bhatia, whose Texas-based company, Techmate, did equipment
servicing for Freedom Medical.  USMX 3 (11/10/08 Bhatia Dep.) at
169.  In the spring of 2003, while Salario was still employed at
Freedom Medical, he and Bhatia discussed starting their own
medical equipment business.  They decided to form a new company,
U.S. Med, to rent, sell, and service such equipment.  Salario
informed Bhatia about the terms of his non-competition agreement
with Freedom Medical and stated that the only place he could do
business in the medical equipment sector was Louisiana.  Given
that limitation, they determined that Salario would work out of
Louisiana and grow their company's operations in that state.
Bhatia would remain in Texas to manage the company and control
its finances.  PX-USM 6 (12/8/06 Bhatia Dep.) at 58-59.  U.S. Med
was incorporated that June.  USMX 1 (U.S. Med Arts. of Incorp.).

Around the same time, in the early summer of 2003,
Salario became aware of a business opportunity for Techmate
through his work at Freedom Medical.  Salario learned from a co-
worker that Freedom Medical had passed on the chance to purchase
medical equipment from an Atlanta hospital.  Salario told Bhatia
about the potential deal, and Techmate bought the devices.  PX-

USM 5 at 74-78.

In August 2003, Salario left Freedom Medical and took a
position with U.S. Med in Louisiana.  Id. at 17-18.  U.S. Med
acquired Techmate approximately a year and a half later, in
January 2005, and Salario became a joint owner of U.S. Med with
Bhatia.  USMX 3 (12/8/06 Bhatia Dep.) at 89-95.

Prior to that acquisition, Techmate and U.S. Med worked
in tandem.  Techmate, from its Houston offices, supported the new
company by performing billing work, maintaining lists of U.S. Med
inventory, handling accounts payable, taking customer service
phone calls, servicing and storing U.S. Med equipment, and making
equipment available to U.S. Med on a rent-to-re-rent basis.  The
two companies also shared office space in Houston, and Techmate
paid Salario's salary at U.S. Med.  PX-USM 4 (11/10/08 Bhatia
Dep.) at 84, 90-97, 99-100, 108, 119-20.  During the first year
of U.S. Med's existence, Bhatia maintained overall managerial
control over the company and supplied it with cash loans.
Salario also loaned $35,000 to Techmate in either 2003 or 2004 to
help fund Techmate's purchase of equipment that it would then
rent or sell to U.S. Med Equip.  PX-USM 6 at 73-74, 91-92; PX-USM
4 at 111-13.

In September 2003, two other Freedom Medical employees
left to join Techmate and U.S. Med, respectively.  That month,
Techmate hired an employee from the Houston branch office and

U.S. Med hired the manager of Freedom Medical's New Orleans branch, Bob Navo.  PX-USM 10 (10/16/08 Gwynn Aff.) ¶¶ 8, 10.

### b.   Cease and Desist Letters

Based on the two Freedom Medical defections and perceived ties between U.S. Med and Techmate, Freedom Medical engaged outside counsel to send letters to Salario and Techmate reminding them of Salario's obligations under his employment agreements.  Id. ¶ 12.

On September 22, 2003, counsel for Freedom Medical sent a letter to Salario, stating that Freedom Medical believed him to be in breach of both the terms of the 1999 engagement letter and his 2001 non-compete agreement.  In particular, Freedom Medical noted that Salario had breached the non-solicitation provisions of his contracts by employing Bob Navo and persuading current and potential customers to discontinue their relationships with Freedom Medical, all within one year of Salario himself leaving the company.  Freedom Medical also stated its belief that Salario was breaching the non-competition provisions of his contracts through "business operations that [he was] directly and/or indirectly involved with in Houston, Texas."  Finally, Freedom Medical informed Salario that it believed he was "in possession of and [was] using for [his] benefit, confidential information and corporate property."  Docket No. 402-3 (9/22/03 Letter from

G. McCarthy to G. Salario).

In its letter, Freedom Medical demanded that Salario return all Freedom Medical corporate and confidential property, including customer lists and financial information, by no later than 3:00 p.m. on October 3, 2003. Freedom Medical also demanded that Salario immediately stop soliciting any Freedom Medical customers or employees and conducting business in areas covered by the restrictive covenant in Salario's employment agreement. The letter went on to say that Freedom Medical "intend[ed] to vigorously protect its rights and pursue all available legal remedies against [Salario] in furtherance thereof."

Salario's attorney responded to Freedom Medical in a three-paragraph letter, dated October 2, 2003. He stated that he did not believe Salario was in violation of any agreement with Freedom Medical, as he was "doing business solely and exclusively in Louisiana." Docket No. 402-4 (10/2/03 Letter from J. McLindon to G. McCarthy).

On October 7, 2003, Freedom Medical's attorney also sent a letter to Bhatia. The letter informed Bhatia of the non-solicitation and non-compete provisions of Salario's contracts with Freedom Medical and stated that it believed "Mr. Salario is violating these restrictions with respect to business operations that he may be involved in, directly or indirectly, with you and your company." Freedom Medical stated that, if its suspicions

proved correct, it intended to hold Bhatia responsible "for all violations of law, including, without limitation, tortious interference with its contractual relationship with Mr. Salario." Docket No. 402-5 (10/7/03 Letter from G. McCarthy to G. Bhatia).

One week later, counsel for Freedom Medical contacted Salario's attorney by letter. The letter stated that, assuming Salario was only conducting business in Louisiana as his attorney claimed, Salario was nevertheless soliciting customers and had solicited an employee of Freedom Medical in violation of Salario's contractual obligations. Freedom Medical again demanded that Salario return all confidential information in his possession and that he cease and desist from contacting its customers and workers. Freedom Medical confirmed its intent to pursue appropriate legal relief if informal resolution was not possible, noting that "any litigation filed will be instituted in the Commonwealth of Pennsylvania." Docket No. 402-6 (10/14/03 Letter from G. McCarthy to J. McLindon).

c.   Salario's Subsequent Contacts with Freedom
     Medical Employees

In late January or early February 2004, Salario asked Joseph W. Janssens, Freedom Medical's Baltimore branch manager, to refer equipment sales, rental, and servicing opportunities to

U.S. Med.[6]  In February, Janssens informed Salario about two

opportunities to rent equipment to Freedom Medical customers,

Providence Hospital and Hadley Memorial Hospital.  Following that

conversation, Salario provided Janssens with letters to

Providence Hospital on U.S. Med letterhead, offering rental and

purchase arrangements for various pieces of machinery.  PX-USM 12

¶¶ 9, 12-13.

          Later that spring, Salario learned that one of Freedom

Medical's technicians, Heidi Nolen, was seeking other employment.

Salario spoke with Nolen and told her he would see if he knew

someone who could offer her a job or if he could offer her a job

at a later point.  In April or May of that year, Salario

introduced Nolen to Bhatia, who offered her a position with

Techmate.  Nolen decided to take the job, resigning from her

position at Freedom Medical in May 2004 and starting her new job

at Techmate approximately one week later.  PX-USM 11 (7/25/08

Nolen Dep.) at 30-31, 34-36.

          Following his departure from Freedom Medical, Salario

also remained in regular telephone contact with Gillespie, with

whom he had started Harbor Medical, LLC.  During telephone

---

[6] Freedom Medical originally named Janssens as a defendant
in this suit, alleging both RICO and state law claims against
him.  On September 14, 2007, the Court granted summary judgment
in Janssens' favor on the RICO claims and dismissed without
prejudice the state law claims against him for want of
supplemental jurisdiction.  Freedom Med. Inc. v. Gillespie, No.
06-3195, 2007 WL 2713222 (E.D. Pa. Sept. 14, 2007).

conversations between Gillespie and Salario over an unspecified time period, but particularly in 2004, Salario would ask Gillespie about Freedom Medical's financial status and efforts to resolve its problems with its secured lender, Wachovia Bank.[7]  At some point after August 2004 and before 2006, Salario informed Gillespie that he had a contact within Freedom Medical who could steal equipment for U.S. Med, although Salario never told Gillespie the name of this contact.  PX-H 2 ¶¶ 19, 23.

In the spring of 2005, Salario also told Gillespie that he had an arrangement with Rick Burgess, a Freedom Medical branch manager, who was referring certain business opportunities to Salario for compensation.[8]  Id. ¶ 25.  Burgess had entered into an agreement with Salario in January of that year to receive rental equipment from U.S. Med, distribute the equipment to customers in the Indianapolis market, and then return the

---

[7] In his affidavit, Gillespie goes on to state that he had formed the impression that Salario "was hopeful Freedom Medical would be forced into bankruptcy and collapse as a competitor of U.S. Med."  He also believes that, during this period, Salario was using information about Freedom Medical's financial difficulties to encourage its employees to start doing deals for U.S. Med and to solicit Freedom Medical's customers away from the company.  PX-H 2 ¶ 19.  What Salario hoped is beyond Gillespie's knowledge and Gillespie does not establish how, based on his own personal knowledge, he came to the other conclusions he describes.  For that reason, the Court cannot accept such statements as part of the evidentiary record.  See Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge . . . .").

[8] As noted above, Burgess is currently a defendant in this suit, although he has taken no action in this case since 2006.

equipment to U.S. Med at the end of the customer's rental period. In return, U.S. Med paid Burgess a commission of 25%. In his job as a branch manager for Freedom Medical, Burgess received a 4% commission. Docket No. 403-14 (2/8/07 Burgess Dep.) at 68-76.

### 3. American Medical Logistics, LLC

In early 2004, Rivera, who had been terminated as Freedom Medical's New York area branch manager the previous December, formed American Medical Logistics, LLC ("AML") to engage in the business of buying, selling, and renting biomedical equipment in the New York area. Gillespie provided working capital for Rivera's new company and discussed this business development with Salario. PX-H 2 ¶ 13; USMX 9 (3/16/09 Rivera Aff.) ¶¶ 3-4. Once AML was established, Gillespie diverted a number of business opportunities from Freedom Medical to AML. Signature Medical and Salario, through U.S. Med, provided equipment that AML needed to fill customer orders for these transactions.[9] PX-H 2 ¶ 13.

---

[9] Gillespie also asserts that the diversion of business opportunities was done "with the full knowledge of Salario" and that Salario "supported the effort to help Rivera divert business opportunities of Freedom Medical in the New York Metro area." PX-H 2 ¶ 13. As with other statements in Gillespie's affidavit, these assertions go beyond Gillespie's personal knowledge. Moreover, Gillespie does not state what specific information he conveyed to Salario that would permit the Court to accept his characterization of Salario's knowledge.

4.   Med Logic

The next year, in early 2005, Gillespie created a fictitious business entity named Med Logic with the intent of using it as a vehicle for acquiring medical equipment for AML and U.S. Med.  Gillespie discussed creation of Med Logic with Salario.  Salario told Gillespie that he supported the undertaking, identified the types of equipment U.S. Med would be interested in obtaining from Med Logic, and told Gillespie to keep an eye out for opportunities to acquire such inventory. Gillespie then used Med Logic to procure equipment and sell it to U.S. Med.  Gillespie did not inform the owners of Freedom Medical, Gwynn and Greco, that he had formed this side business. Id. ¶ 20.

In November 2005, Gwynn and Greco asked Gillespie to assist them in selling 166 Baxter 6201 infusion pumps that they had purchased either in their individual capacities or on behalf of a business Greco had created.   Id. ¶ 22; USM Reply Ex. 5 (12/3/08 Gwynn Dep.) at 275, 295, 309-11.  Gillespie represented that all of the infusion pumps would be conveyed, through Signature Medical, to a purchaser in Michigan.  Instead, Gillespie sold 100 of the pumps to U.S. Med through Med Logic. PX-H 2 ¶ 22.  Gwynn did not care who purchased the equipment and, as far as he was concerned, he and Greco received adequate compensation from the sale.  USM Reply Ex. 5 at 309.  In

connection with the transaction, Salario asked Gillespie to access the confidential proprietary database of Freedom Medical and provide him with inventory information about the Baxter 6201 infusion pumps Freedom Medical had rented to customers in Texas. Gillespie gave Salario the information.  PX-H 2 ¶ 22.

### 5.   Signature Entities

#### a.   Formation of Signature Entities

Clifford Hall was an employee of Freedom Medical from approximately October 16, 2000 to June 1, 2001.  Id. ¶ 3.  Within six months to a year after leaving Freedom Medical, Mr. Hall began doing business under the name Signature Medical, Ltd., LLC ("Signature Medical"), incorporating Signature Medical as an independent legal entity on September 18, 2003.  For the first six to eight months of Signature Medical's business operations, Gwynn and Greco of Freedom Medical supplied Mr. Hall with medical equipment that he would strip down to its component parts and sell, dividing the profits with Gwynn and Greco.  Eventually, Signature Medical began selling, renting, and servicing medical equipment.  At first, the business operated out of the home that Mr. Hall shared with his wife.  Signature Medical moved to separate offices on Huddell Avenue in late 2004 or early 2005.  PX-H 1 at 72-73, 75, 79-83, 88; PX-H 4 (Signature Med. Cert. of

Org.).

Mr. Hall and Gillespie had been acquaintances when they both worked at Freedom Medical. After leaving and starting Signature Medical, the two men became friends. At Mr. Hall's request, Gillespie caused Freedom Medical to enter into business transactions with Signature Medical on terms that were more favorable than those offered to other of Freedom Medical's customers and suppliers. In all, between 2004 and 2006, Gillespie secured the sale of over 100 pieces of equipment from Freedom Medical to Signature Medical. Gillespie also referred a number of business opportunities to Signature Medical for a commission. Gillespie did not secure approval from Freedom Medical's owners before consummating disproportionately favorable transactions with Signature Medical. Nor did he disclose his business referrals to Gwynn and Greco. PX-H 2 ¶¶ 3-5.

In late 2003 and early 2004, Freedom Medical began scaling back its operations in the market for emergency medical services ("EMS") equipment and consolidated that portion of its business with other activities already under Gillespie's purview as vice president of marketing and sales. In view of this development, Mr. Hall and Gillespie decided to form an EMS business of their own. On March 3, 2004, they created Signature Emergency Products, LLC ("SEP"), and set about diverting business opportunities from Freedom Medical to SEP. Salario's company,

U.S. Med, was an occasional customer of SEP. Id. ¶¶ 6, 17; PX-H
5 (SEP Bus. Entity Filing History).

As part of the competitive strategy adopted by
Gillespie and Mr. Hall, in 2005, SEP hired Fred Howland, the last
employee of Freedom Medical's EMS division. Gillespie arranged
for Howland to take with him to SEP a Dell computer containing
Freedom Medical's database management system, known as TeleMagic.
TeleMagic contained proprietary information about current and
potential EMS customers, including their purchasing preferences,
buying history, and contact information. SEP used this Freedom
Medical system to aid its sales and marketing activities. Id. ¶¶
7-9. After Howland left SEP, he trained a replacement to work
with TeleMagic. PX-H 18 (2/2/07 Howland Dep.) at 42-43.

b.    Dawn Hall's Involvement in Signature Entities

Although she was not an employee of either Signature
entity, Ms. Hall performed tasks for her husband's businesses,
both while Signature Medical operated out of her home and after
the businesses moved to separate offices. When Mr. Hall first
created Signature Medical and was working from the couple's home,
Ms. Hall would answer the phone and take messages relating to
business matters. She would also sit with her husband while he
did work in the evening hours. Hall Reply Ex. A (1/3/13 S. Hall
Aff.). In 2004 and 2005, George Rivera rented medical equipment

for his AML business from Signature Medical, often re-renting the equipment and splitting the rental revenue with Signature Medical.  When he wanted to start or stop renting a piece of equipment, he talked with or sent a fax to Clifford, Dawn Hall, or another Signature employee.  USMX 9 ¶ 9.  Over those two years, Rivera sent tens of faxes to Ms. Hall, some of which she stamped or signed to confirm receipt.  PX-H 9 (Facsimile Transmissions from G. Rivera to S. Hall).  Ms. Hall did not establish the terms of any of these rental transactions.  Hall Reply Ex. A.

Fred Howland, Martin Crouch, Jason Ragazzo, Jasper Smith, and Richard Collinson, all of whom did work for either Signature Medical or SEP between 2004 and 2006, recall that Ms. Hall performed various administrative functions for the companies.[10]  Howland, the SEP employee, spoke to Ms. Hall "numerous times" when she was "refurbishing equipment[] or handling customer service calls."  Howland is "pretty certain" that Ms. Hall sent him e-mails regarding customer service issues while he worked for SEP.  PX-H 18 at 40, 137.  Ms. Hall did have a Signature Medical e-mail address.  PX-H 10 (6/14/07 Hr'g Tr.) at 9.

_____

[10] As noted above, Crouch and Smith are currently defendants in this suit.  Default has been entered against Crouch, and Smith has not actively participated in this suit since 2006.  Ragazzo was formerly a defendant in this suit.  The parties agreed to and the Court ordered his dismissal on February 28, 2008.  Docket No. 348 (2/28/08 Stip. & Order of Dismissal).

During his employment with Signature Medical in 2004, Martin Crouch saw Ms. Hall perform shipping and receiving work for the business. PX-H 7 (4/29/08 Crouch Dep.) at 215. Jason Ragazzo, who serviced equipment for Signature Medical, worked on infusion pumps with Ms. Hall at the Signature entities' business location on Huddell Avenue and recalls Ms. Hall answering phones for the Signature businesses. PX-H 16 (4/28/08 Ragazzo Dep.) at 41-42. Jasper Smith also repaired equipment in Signature Medical's possession, while at the same time working as an employee of Freedom Medical. Smith saw Ms. Hall at the Huddell Avenue offices answering phones, cleaning equipment, and doing paperwork. Ms. Hall also spoke to Smith about customers' technical support questions. PX-H 17 (2/7/08 Smith Dep.) at 16, 39-40, 54-56, 115-17.

In doing his work for Signature Medical, Smith noticed that some of the equipment he repaired bore Freedom Medical stickers. At Freedom Medical, Smith had observed that Freedom Medical often purchased equipment that still had another entity's stickers on it. In Smith's experience, the presence of a company's sticker did not always mean the company continued to own the equipment. Id. at 61-65.

Richard Collinson, who worked for SEP in 2005 or 2006, saw Ms. Hall doing work in the Signature offices every day that he was there until near the end of his employment. Both

Collinson and Ms. Hall attended a training session for SEP's billing software, which was purchased from a vendor in New Jersey. According to Collinson, Ms. Hall did billing work in a conference room that contained two computers. PX-H 19 (6/2/08 Collinson Dep.) at 39, 102, 104-06.

In addition, Ms. Hall loaned money to her husband and was paid back through checks drawn on Signature Medical's accounts with both Commerce Bank and Citizens Bank. PX-H 10 at 11; PX-H 11 (Executed Checks); Hall Reply Ex. A. Ms. Hall never purchased or sold equipment on behalf of her husband's businesses. Hall Reply Ex. A.

D.   <u>Freedom Medical's Bankruptcy</u>

On December 29, 2004, Freedom Medical filed for Chapter 11 bankruptcy in the Eastern District of Pennsylvania. <u>In re Freedom Med., Inc.</u>, No. 04-37092 (Bankr. E.D. Pa.) (Docket No. 1). During those proceedings, U.S. Med was one of Freedom Medical's unsecured creditors. Under Freedom Medical's plan of reorganization, its creditors were entitled to the distribution of proceeds from causes of actions asserted by Freedom Medical. Docket No. 402-10 (9/9/05 Debtor's Second Am. Plan of Reorg.) §§ 4.10, 11.1. Freedom Medical did not disclose any claims against Salario, Bhatia, or U.S. Med at any point during its Chapter 11 bankruptcy proceedings, which concluded on May 26,

2006.  Freedom Medical did list certain other causes of action on its debtor's disclosure form: an unliquidated claim against RBC then pending in this court and "potential claims" against several specific individuals and entities, including Gwynn and Greco. See Docket No. 402-13 (9/9/05 Debtor's Disclosure Stmt., Ex. A: Liquidation Analysis); In re Freedom Med., No. 04-37092 (Docket No. 609).

      E.    Theft of Freedom Medical Equipment

In April 2006, Freedom Medical became aware that a number of items in its inventory appeared to be missing. Included among the missing items were two LTV ventilators, bearing serial numbers CO2948 and CO2970.  On April 26, Freedom Medical contacted the manufacturer of the ventilators, Pulmonetics Systems, Inc. ("Pulmonetics") to inquire about their status.  Pulmonetics informed Freedom Medical that its records listed Signature Medical as the owner of the two ventilators. After consulting Pulmonetics, Freedom Medical's executives, including Gillespie, discussed possible next steps.  They decided to contact law enforcement about the missing equipment and undertake an internal investigation into whether Freedom Medical employees had been stealing equipment.  PX-USM 18 ¶¶ 9, 11-13.

A criminal investigation into the activities of Mr. Hall and the Signature entities ensued, and Mr. Hall was placed

on trial in May 2008.  See Docket No. 375 (5/1/08 Order).

As it turns out, beginning as early as 2004, Martin Crouch, who was a Freedom Medical employee while moonlighting at Signature Medical, and several other individuals, some of whom also did work for the Signature entities, stole equipment from Freedom Medical and sold it to Mr. Hall or others working for Signature Medical.  PX-H 7 at 30-40, 50; PX-USM 25 (4/28/08 Ragazzo Dep.) at 86, 94-96; PX-H 1 at 65-66.  Signature Medical then resold, rented, or traded that equipment.

Mr. Hall was ultimately convicted of offenses relating to the theft of Freedom Medical inventory, including receipt of stolen equipment and conspiracy to commit theft.[11]  PX-H 1 at 65. Ms. Hall was not arrested or charged in connection with the equipment theft.  Nor was she the subject of a criminal subpoena or search warrant.  Ms. Hall was not aware of any business opportunities that were inappropriately diverted from Freedom Medical to the Signature entities and had no knowledge of

---

[11] Freedom Medical asserts that Mr. Hall was convicted on several felony and misdemeanor counts relating to the theft of 71 pieces of Freedom Medical inventory, including LTV ventilators CO2948 and CO2970.  Pl.'s Opp. to U.S. Med Def'ts' Mot. Summ. J. at 15.  Freedom Medical has not provided evidence of the offenses for which Mr. Hall was convicted or directed the Court to the docket number for his criminal matter.  The only evidence in the record is Mr. Hall's deposition testimony that he was convicted of the offenses referenced in the above main text.

Freedom Medical further asserts, without supporting evidence, that two current defendants in this case, Martin Crouch and Omar Hunt, and a former defendant, Jason Ragazzo, pled guilty in connection with the thefts from Freedom Medical.  Id.

deliveries of stolen equipment to her home.  Hall Reply Ex. A.

Jason Ragazzo was one of those who sold stolen Freedom Medical equipment to Mr. Hall in 2004.  He initially thought Mr. Hall would want to purchase such equipment because he had already seen inventory in Mr. Hall's garage that he believed belonged to Freedom Medical.  When Ragazzo was doing repair work, he noticed that some equipment had an adhesive residue in the same spot where Freedom Medical usually affixed stickers to its inventory.  PX-USM 25 at 86-95.  Ragazzo was never asked to steal anything by Ms. Hall.  PX-H 16 at 42.

F.   U.S. Med Defendants' Possession of Stolen Equipment

Since opening its investigation, Freedom Medical has maintained a running list of equipment it believes was stolen, adding items to the list throughout the course of discovery in this action.[12]  In all, Freedom Medical has identified 75 allegedly stolen items that wound up in U.S. Med's possession between 2004 and 2006.  PX-USM 17 (Missing Equip. List); PX-USM 18 ¶¶ 20-22.  At that time, U.S. Med maintained upwards of 3,000 pieces of equipment in its inventory.  Bhatia, on behalf of U.S.

_____

[12] According to Freedom Medical, it has produced in discovery documentation evidencing its ownership of each item on its missing items list.  PX-USM 18 ¶ 22.  Although it has not provided that proof of ownership to the Court, the moving defendants do not dispute the fact that Freedom Medical has rightful ownership of all equipment on the list or the fact that the units listed were stolen.

Med, has provided information on 66 of those pieces of equipment, including the source from which the unit was received and the equipment's present status.  According to Bhatia, U.S. Med received many of these pieces of equipment through transactions with Signature Medical.  <u>See</u> PX-USM 16 (9/13/12 Bhatia Aff.) ¶¶ 15, 21.

### 1.  <u>Equipment Obtained From Signature Medical</u>

In either 2003 or 2004, Salario suggested to Bhatia that they rent equipment from Signature Medical because it had the equipment their business needed.  Bhatia agreed with Salario's suggestion.  PX-USM 6 at 115.  It is possible Gillespie made Mr. Hall aware of the opportunity to do business with Salario's company at roughly the same time, as well.  USM Reply Ex. 8 (8/20/12 C. Hall Dep.) at 194.

U.S. Med began renting biomedical equipment from Signature Medical in January 2004.  U.S. Med continued renting and purchasing equipment until April 25, 2006, and serviced equipment for Signature Medical as late as May 2006.  PX-USM 16 ¶ 21.  Both Salario and Bhatia spoke with Mr. Hall to arrange at least some of these transactions.  PX-USM 6 at 114-15.  In the course of dealings between the two companies, neither Bhatia, Salario, or anyone else from U.S. Med asked Mr. Hall about the identity of his vendors or suppliers.  USM Reply Ex. 8 at 202.

Mr. Hall also never had any conversations with any person from U.S. Med about stealing or otherwise unlawfully procuring medical equipment that belonged to Freedom Medical for them to sell or rent through their companies.[13]  Docket No. 546 (7/23/12 C. Hall Aff.) ¶¶ 3-4.

Two specific ventilators that U.S. Med received from Signature Medical for servicing and that are included on Freedom Medical's missing equipment list are Pulmonetics-brand LTV ventilators bearing serial numbers CO2970 and CO2948.  U.S. Med serviced these two ventilators on March 28, 2005, and, when U.S. Med filed its service reports with Pulmonetics, it listed Signature Medical as the owner of the machines.  PX-USM 33 (11/11/08 Salario Dep.) at 168; PX-USM 30-31 (Pulmonetics Sys.

---

[13] At deposition, Jason Ragazzo, the Signature Medical serviceman, testified that he spoke to Mr. Hall about a ventilator that Ragazzo had stolen from Freedom Medical and sold to Mr. Hall.  According to Ragazzo, he asked Mr. Hall about leaving the serial number on the stolen ventilator and Mr. Hall responded that he had sent the ventilator to Salario, who "knew what was going on" and "was taking care of it."  PX-USM 25 at 221-23.  Mr. Hall's statement is hearsay and, as such, cannot be considered at the summary judgment stage.  Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009).  At oral argument, counsel for Freedom Medical asserted that Mr. Hall's statement was admissible as a party admission.  3/14/13 Hr'g Tr. at 25-26.  Although the statement constitutes a party admission by and is admissible against Mr. Hall, the declarant, the statement is not an admission by and is not admissible against Salario.  See Fed. R. Evid. 801(d)(2)(A).  It could be offered against Salario if he and Mr. Hall were members of a conspiracy and the statement were made in furtherance of their conspiracy.  See Fed. R. Evid. 801(d)(2)(E).  For reasons discussed later in this opinion, the Court does not find there to be sufficient evidence of a conspiracy to warrant admission of the statement on that non-hearsay ground.

LTV® Serv. Records).

After receiving the service reports, in April 2005, Pulmonetics notified U.S. Med that Pulmonetics' records listed Freedom Medical, not Signature Medical, as the owner of the ventilator. Pulmonetics asked U.S. Med to confirm correct ownership. PX-USM 30-31 (4/18/05 E-mails from L. Kanan to S. DuMenil). U.S. Med did not do so on its own. PX-USM 32 (10/26/12 Kanan Dep.) at 37, 43. Rather, Salario called Mr. Hall and directed him to straighten out the ownership discrepancy with Pulmonetics. Mr. Hall responded that he would. Salario did not later confirm whether Mr. Hall had clarified correct title to the ventilators with Pulmonetics. PX-USM 33 at 168-73. Bhatia, who also became aware of the discrepancy as to title, did not contact Freedom Medical to address the issue. PX-USM 4 at 153.

Both Salario and Bhatia believe that they also returned the two ventilators to Signature Medical after servicing them. PX-USM 33 at 173; PX-USM 4 153, 156. That does not appear to be correct with respect to one or both of the ventilators. Beginning in March 2005, U.S. Med re-rented ventilator CO2970 to its customer, Caremax Medical ("Caremax"), receiving rental income on the item through February 2006. PX-USM 38 (U.S. Med Rental Report). The parties dispute the present location of this ventilator. Bhatia believes that ventilator CO2970 is now in the possession of Freedom Medical. PX-USM 16 ¶ 21(k). Freedom

Medical contends that it does not have the ventilator. PX-USM 18 ¶ 26(c).

At some point in the spring of 2005, U.S. Med also began renting ventilator CO2948 to a company named Advanced Home Care. PX-USM 16 ¶ 21(l). U.S. Med then sold the ventilator to Advanced Home Care in June 2005, although it continued to pay Signature Medical a rental fee for that piece of equipment into 2006. PX-USM 35 (U.S. Med Invoice 2039); PX-USM 36 (Signature Med. Rental Invoice 12009). According to Bhatia, in February 2006, U.S. Med provided Signature Medical with an equivalent ventilator in exchange for ventilator CO2948. Bhatia has not been able to find e-mail communications or documents regarding this unit exchange. PX-USM 16 ¶ 21(l). Signature Medical's records reflect that both ventilators CO2970 and CO2948 remain in U.S. Med's possession. PX-USM 39, Item Nos. 249-50.

### 2. Equipment Obtained Directly From Freedom Medical

The U.S. Med Defendants and Freedom Medical dispute how U.S. Med came into possession of another Pulmonetics LTV ventilator included on Freedom Medical's missing equipment list. Bhatia states that U.S. Med purchased ventilator BO1518 from Freedom Medical in September 2003 and later sold that ventilator to Caremax. PX-USM 16 ¶ 21(ccc). Freedom Medical maintains that it never sold this LTV ventilator to U.S. Med, and states that it

has no documentation evidencing sale of this item. PX-USM 18
¶ 26(f). During his 2006 deposition, Bhatia claimed that U.S.
Med had paperwork evidencing its ownership of ventilator BO1518.
Freedom Medical notes that U.S. Med has produced an invoice
showing only that it purchased from Freedom Medical another
ventilator whose serial number differs by one digit: ventilator
BO1508. See PX-USM 41 (Freedom Med. Invoice 01-4577025). For
its part, Pulmonetics' records list Freedom Medical as the
machine's owner. PX-USM 18, Ex. F.

In addition, Bhatia identifies in his affidavit eleven
pieces of equipment that Freedom Medical shipped to U.S. Med for
servicing in April 2003. None of these items has been returned
to Freedom Medical. According to Bhatia, Freedom Medical owed
U.S. Med a "substantial amount of money," and U.S. Med's
retention of these units was part of a reconciliation process.[14]
PX-USM 16 ¶ 21(bb). Freedom Medical denies that it either owed
U.S. Med a significant amount of money in 2003 or conveyed title
to this equipment to U.S. Med. It further asserts that U.S. Med
has not produced any documentation substantiating either claim.

---

[14] Three of these pieces of equipment are currently
"quarantined," presumably while ownership issues are resolved.
Four other pieces of equipment have been marked as missing,
either lost during Hurricane Katrina or otherwise lost by a
customer to whom it was rented. One is currently on rental, but
U.S. Med has asked that it be returned. U.S. Med sold the final
three machines in this batch to various customers: two were
mistakenly not quarantined following initiation of this lawsuit
and were sold in 2009 and 2011, respectively; one was sold in May
2005, prior to this suit being filed. PX-USM 16 ¶ 21(bb).

PX-USM 18 ¶ 26(d).

### 3.  Conversations Regarding Equipment Theft

In 2006, after becoming aware that law enforcement had opened an investigation into the theft of Freedom Medical inventory, Gillespie reviewed Freedom Medical's missing equipment list.  He realized that five pieces of equipment he had rented to U.S. Med were included on the list.  Gillespie had obtained the five items through an equipment swap with Mr. Hall.  Upon making this discovery, Gillespie contacted Salario and informed Salario that the rented equipment appeared to have been stolen from Freedom Medical.[15]  He asked Salario to return the machines to him, which Salario did.  Gillespie then brought the inventory back to the offices of Freedom Medical.  PX-H 2 ¶ 28.

On May 2, 2006, someone from Freedom Medical called Salario and advised him that it appeared Signature Medical had stolen Freedom Medical equipment and that some of the stolen inventory might then be in U.S. Med's possession.  Freedom Medical asked that U.S. Med provide invoices for all inventory rented from Signature Medical.  U.S. Med complied with this

_____

[15] It is not clear from Gillespie's affidavit, but it seems that he rented the equipment to U.S. Med through his fictitious company, Med Logic.  Shipping invoices from the period April-July 2006 reflect that U.S. Med sent several pieces of equipment to Med Logic.  PX-USM 29 (4/06-7/06 UPS Daily Shipment Detail Report).

request.[16]  Upon reviewing the rental invoices, Freedom Medical realized that numerous items on its missing equipment list had been rented to U.S. Med.  Someone from Freedom Medical called Salario again and left a follow-up voicemail, conveying that many items rented to U.S. Med actually belonged to Freedom Medical and requesting that U.S. Med provide Freedom Medical with a list of the serial numbers for all of its inventory.  Despite leaving several additional voicemails, Salario did not return the calls from Freedom Medical staff and did not provide Freedom Medical with a list of serial numbers for additional equipment.  PX-USM 18 ¶¶ 17-18; USMX 7 (11/14/08 Gwynn Dep.) at 114-15.

In addition to returning equipment to Gillespie at his request, between April and June 2006, U.S. Med shipped several allegedly stolen pieces of equipment back to Signature Medical, from which the devices had been purchased.  PX-USM 16 ¶ 21; PX-USM 29.  For example, on May 25, 2006, U.S. Med shipped ventilator A03298 back to Signature Medical.  PX-USM 27.

---

[16] Mr. Hall testified at his deposition that, after he learned, during a meeting on May 18, 2006, that law enforcement was inquiring into the ownership of LTV ventilators CO2970 and CO2948, he believes he told U.S. Med about that development, although he is not sure.  PX-USM 44 (8/20/12 C. Hall Dep.) at 255-56.

II.  <u>Analysis</u>[17]

Freedom Medical asserts that the U.S. Med Defendants
and Ms. Hall committed substantive violations of RICO and
participated in a RICO conspiracy.  Freedom Medical also brings
several state law causes of action against each of these
defendants.

The U.S. Med Defendants and Ms. Hall separately move
for summary judgment on all claims against them.  The Court
concludes that Freedom Medical has failed to establish all
necessary elements of its substantive RICO claim or RICO
conspiracy claim against any of the four moving defendants, and
they are, therefore, entitled to summary judgment on those
claims.  The Court will also grant summary judgment in favor of
Ms. Hall on all of the state law claims alleged against her, but
will deny the U.S. Med Defendants' motion for summary judgment on
the state law claims against them.

_____

[17] Summary judgment is appropriate if there "is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving
party bears the initial burden of demonstrating the absence of
any genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>,
477 U.S. 317, 323 (1986).  The Court must consider the evidence
in the light most favorable to the non-moving party.  Once a
properly supported motion for summary judgment is made, the
burden of production shifts to the non-moving party, who must set
forth specific facts showing that there is a genuine issue for
trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250
(1986).

A.  Substantive RICO Claim

Freedom Medical brings a RICO claim under 18 U.S.C.

§ 1962(c) against all four of the moving defendants.  That

section of the RICO statute provides as follows:

> It shall be unlawful for any person employed by or
> associated with any enterprise engaged in, or the activities
> of which affect, interstate or foreign commerce, to conduct
> or participate, directly or indirectly, in the conduct of
> such enterprise's affairs through a pattern of racketeering
> activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  To make out a claim for a violation of

§ 1962(c), a plaintiff must demonstrate that each defendant

(1) conducted or participated in the conduct (2) of an enterprise

(3) through a pattern (4) of racketeering activity.  Lum v. Bank

of Am., 361 F.3d 217, 223 (3d Cir. 2004).

A RICO enterprise is defined as "any individual,

partnership, corporation, association, or other legal entity, and

any union or group of individuals associated in fact although not

a legal entity."  18 U.S.C. § 1961(4).  Thus, an enterprise may

be a legal entity or an association in fact.

This case involves an association in fact.  Freedom

Medical asserts that, from 2001 to 2006, all originally named

defendants worked together to steal equipment from Freedom

Medical and its suppliers and to divert Freedom Medical's

business opportunities for their own benefit, all through a

pattern of racketeering.[18]  The central figure, or "hub," who allegedly coordinated the various activities and aspects of this would-be enterprise is former defendant Thomas Gillespie, with each of Salario, Rivera, and Mr. Hall, through their own business entities, serving as crucial secondary hubs in the scheme. Second Am. Compl. ¶¶ 46, 105-06; see also Freedom Med. Inc. v. Gillespie, 634 F. Supp. 2d 490, 505-06 (E.D. Pa. 2007).

Ms. Hall argues that Freedom Medical's RICO claims against her fail because, even assuming such an enterprise existed, she did not conduct or participate in the conduct of that enterprise through a pattern of racketeering activity.  The U.S. Med Defendants, on the other hand, attack each prong of Freedom Medical's substantive RICO claim, including the very existence of an enterprise.

### 1.  Ms. Hall

The Court finds that, even if an association-in-fact enterprise existed, Ms. Hall neither conducted its affairs nor did so through a pattern of racketeering activity.

---

[18] The second amended complaint names additional victims of the defendant's alleged enterprise; however, the parties' arguments and the evidence presented to the Court as part of the summary judgment record relate solely to an alleged enterprise targeting Freedom Medical.

a.   Conduct/Participation

To be liable under § 1962(c), a defendant must "conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs."  18 U.S.C. § 1962(c).  Mere association with an enterprise is not sufficient to violate the RICO statute.  In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 370 (3d Cir. 2010).  The defendant must have "participated in the operation or management of the enterprise itself."  Reves v. Ernst & Young, 507 U.S. 170, 183 (1993).

An enterprise is "operated" not only by upper management, but also by "lower rung participants . . . who are under the direction of upper management."  Id. at 184.  Under this test, RICO liability runs to those "who do not hold a managerial position within an enterprise, but who do nonetheless knowingly further the illegal aims of the enterprise by carrying out the directives of those in control."  United States v. Urban, 404 F.3d 754, 770 (3d Cir. 2005) (quoting United States v. Parise, 159 F.3d 790, 796 (3d Cir. 1998) (quotation marks omitted).  The Court of Appeals for the Third Circuit has stated that this element of § 1962(c) renders liable those individuals whose actions are "'plainly integral to carrying out' the enterprise's activities" and has cautioned against extending liability to a low-level functionary who was unaware of the enterprise's criminal activities.  Parise, 159 F.3d at 796-97

(quoting <u>United States v. Shifman</u>, 124 F.3d 31, 36 (1st Cir. 1997)).

Freedom Medical seeks to hold Ms. Hall liable as a "lower rung participant" who knowingly furthered the aims of the enterprise by carrying out directives from those above her. Preliminarily, the Court notes that Ms. Hall's participation in the operation or management of the purported enterprise must be judged by her conduct vis-a-vis the alleged association in fact among all defendants, and not just with respect to the Signature entities, themselves.

To begin, Freedom Medical has not established that Ms. Hall ever knew about the Signature businesses' illegal equipment sales or any illicit aims of a bigger enterprise. In her sworn affidavit, Ms. Hall states she was unaware of any business opportunities having been diverted from Freedom Medical to the Signature businesses and that, if any stolen equipment was delivered to her home, she had no knowledge of it. To be sure, Ms. Hall was not investigated, arrested, or criminally charged in connection with those thefts. Hall Reply Ex. A.

Freedom Medical relies on the following pieces of circumstantial evidence to infer Ms. Hall's awareness of the alleged enterprise: (a) Ms. Hall was involved in handling equipment in Signature Medical's possession that may have borne Freedom Medical stickers, (b) Ms. Hall worked in the same

conference room as a computer that may have contained stolen
Freedom Medical software, and (c) the Halls previously testified
that Ms. Hall had no involvement in her husband's operation of
the business, an assertion now controverted by other record
evidence.  See PX-H 10 at 12-14.

This evidence is far too speculative to raise a genuine
issue of material fact as to Ms. Hall's knowing participation in
an unlawful enterprise.  It is not at all certain that Ms. Hall
ever encountered units with Freedom Medical stickers.  Even if
she did see inventory with such stickers, that would not amount
to knowledge of illegal activity.  Gillespie arranged a number of
equipment deals from Freedom Medical to Signature Medical in
which the inventory was sold but not stolen.  Those deals may
have been unduly favorable to Signature Medical, but there was
nothing facially illicit about former Freedom Medical property
being on Signature Medical's premises.  Also, according to Jasper
Smith, a Freedom Medical employee who moonlit as a Signature
Medical repairman, it was not uncommon for Freedom Medical, after
purchasing equipment, to leave in place the stickers of the
previous owner.  It is reasonable to infer that Signature Medical
would also follow that practice or that the presence of a Freedom
Medical sticker would not necessarily suggest that it had been
stolen.[19]

---

[19] Having never worked at Freedom Medical herself, there is
also nothing to suggest that Ms. Hall would have recognized

The evidence pertaining to the two computers in Ms. Hall's work space is equally unavailing. There is no evidence that either one of those computers was the Dell computer containing Freedom Medical's TeleMagic database management system or that Ms. Hall worked with that software. Ms. Hall did, at one point, receive computer training, but that was with respect to billing software from a vendor in New Jersey. The most that can possibly be inferred is that Ms. Hall had reason to believe her husband's business was using software taken from Freedom Medical. That is not sufficient to establish awareness of the multi-participant enterprise alleged in this case or that her activities at the Signature businesses were conducted in knowing furtherance of its objectives. Nor can such conclusions be drawn from Ms. Hall's failure to turn over discovery or attempt to downplay her involvement in the Signature businesses during earlier phases of this litigation. To be sure, the tasks Ms. Hall performed were those necessary to the daily, lawful aspects of the Signature entities' operations, not the distinguishing illicit characteristics of a RICO enterprise.

Even if it were reasonable to impute to Ms. Hall some awareness of illegal activity at the Signature entities, her conduct does not rise to the level of "operation or management"

adhesive sticker residue in a particular spot on inventory as a tell-tale sign that the equipment was owned by Freedom Medical or that it was obtained from Freedom Medical by theft.

of a larger enterprise.  The routine functions Ms. Hall performed

on behalf of her husband's Signature entities had little, if any,

impact on any defendant beyond Signature Medical and SEP and

certainly were not instrumental to depriving Freedom Medical of

business opportunities or inventory.  Ms. Hall handled customer

service phone calls, performed billing work for the Signature

entities, cleaned equipment, and processed Rivera's requests to

start and stop equipment rentals.  There is no suggestion that

she participated in procuring stolen equipment for the Signature

businesses or other enterprise members or that she arranged

rental and purchase transactions for that equipment in the first

instance.

　　　　Although her activities may have been important to the

functioning of the Signature entities, they were, at most,

ancillary, and not "plainly integral," to the overall scheme of

stealing Freedom Medical's equipment or business opportunities.

Parise, 159 F.3d at 796; see also Walter v. Drayson, 538 F.3d

1244, 1249 (9th Cir. 2008) (finding lack of "conduct" element

where enterprise participant's actions were not "indispensable to

achievement of the enterprise's goal").  Ms. Hall is the very

low-level employee, lacking awareness of any larger enterprise's

criminal exploits, who the Third Circuit cautioned against

tagging with RICO liability.  See Parise, 159 F.3d at 796.  As

the Ninth Circuit has noted, "simply being involved" in an

enterprise does not suffice to trigger liability under RICO.
<u>Walter</u>, 538 F.3d at 1249.  "One can be 'part' of an enterprise
without having a role in its management and operation."  <u>Id.</u>  To
the extent an enterprise existed, that is the case with Ms. Hall.

b.  <u>Pattern of Racketeering Activity</u>

          Even assuming that Ms. Hall operated or managed the
activities of an enterprise, that is not enough to establish
liability under RICO.  The final element necessary to Freedom
Medical's RICO claim is proof that Ms. Hall's participation in
conducting the affairs of the enterprise was by means of "a
pattern of racketeering activity."  <u>In re Ins. Brokerage</u>, 618
F.3d at 371 (quoting 18 U.S.C. § 1962(c)) (quotation marks
omitted).

          A pattern of racketeering for purposes of RICO has
several components.  First, it requires multiple iterations of
racketeering activity, which encompasses a wide array of conduct
sanctionable under federal law.  The defendant must have
committed at least two such prohibited acts.  18 U.S.C.
§ 1961(5).  Second, the acts must be related, meaning they have
the same or similar purposes, results, participants, victims,
methods of commission, or other distinguishing characteristics.
<u>H.J. Inc. v. Nw. Bell Tel. Co.</u>, 492 U.S. 229, 239-40 (1989).
Third, the acts must amount to or pose a threat of continued

-40-

criminal activity.  Id. at 239.  "'Continuity' is both a closed-
and open-ended concept, referring either to a closed period of
repeated conduct, or to past conduct that by its nature projects
into the future with a threat of repetition."  Id. at 241.
"Predicate acts extending over a few weeks or months and
threatening no future criminal conduct do not satisfy [the
continuity] requirement."  Id. at 242.

        Put simply, there is nothing in the record to suggest
that Ms. Hall in any way engaged in conduct that could serve as a
predicate act under RICO, let alone a pattern of such activity.
Freedom Medical asserts that each of her fax transmissions to and
from Rivera constitutes a separate predicate act of wire fraud
because those transmissions regard rental of allegedly stolen
equipment.  The elements of wire fraud are (1) a scheme or
artifice to defraud; (2) the defendant's participation with the
specific intent to defraud; and (3) the use of wire transmissions
in furtherance of that scheme.  Nat'l Sec. Sys., Inc. v. Iola,
700 F.3d 65, 105 (3d Cir. 2012).  The record before the Court
does not create a triable issue regarding Ms. Hall's knowledge of
the theft of Freedom Medical devices occurring within her
husband's businesses, much less her willful participation in a
scheme with the specific intent to defraud third-party purchasers
or renters.  More importantly, Freedom Medical offers no evidence
that Ms. Hall knew any of the particular pieces of equipment

referenced in her correspondence with Rivera had been stolen.

Freedom Medical likewise cannot premise a RICO claim against Ms. Hall on the Stolen Property Act, which prohibits the knowing transmission or receipt of stolen property in interstate commerce.  See 18 U.S.C. §§ 2314-15.[20]  Again, there is nothing connecting Ms. Hall to the actual and knowing transport or acceptance of stolen goods.  At most, she cleaned some unlawfully procured equipment and stopped and started rental payments on the equipment once a rental arrangement was already in place, all without knowledge that the equipment had been stolen.  The fact that Ms. Hall assisted her husband's businesses in this manner does not make her liable for all actions of those entities; nor does it make her liable under RICO.


## 2.  U.S. Med Defendants

Because the U.S. Med Defendants contend that Freedom Medical's RICO claim against them founders on the threshold requirement that an enterprise exists, the Court here analyzes

---

[20] In pertinent part, § 2314 makes it a crime to transport, transmit, or transfer in interstate or foreign commerce any goods, wares, merchandise, securities, or money, of the value of $5,000 or more, knowing the same to have been stolen, converted, or taken by fraud.  Section 2315 similarly prohibits receipt, possession, concealment, storage, sale, barter, or disposition of any goods, wares, merchandise, or money, of the value of $5,000 or more, which have crossed a state or United States boundary after being stolen, unlawfully converted, or taken, and where the receiving individual knows the same to have been stolen, converted, or taken.

the evidence of the alleged association-in-fact scheme in greater detail.

In <u>Boyle v. United States</u>, the Supreme Court stated that an association-in-fact enterprise must have three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit the associates to pursue the enterprise's purpose. 556 U.S. 938, 946 (2009). The <u>Boyle</u> Court refused to require any particular type of organizational structure, emphasizing that the concept of an association in fact should be interpreted expansively. 556 U.S. at 944, 948-49; <u>see also</u> <u>United States v. Bergrin</u>, 650 F.3d 257, 267-68 (3d Cir. 2011). As the Third Circuit has since clarified: "<u>Boyle</u> makes clear . . . that although the structure requirement demands that 'the parts' of the association in fact must be 'arranged or put together to form a whole,' the statute does not prescribe any particular arrangement, as long as it is 'sufficient to permit [the enterprise's] associates to pursue the enterprise's purpose.'" <u>In re Ins. Brokerage</u>, 618 F.3d at 367 (quoting <u>Boyle</u>, 556 U.S. at 945-46) (alteration in the original). Ultimately, it is sufficient that the would-be members of the enterprise "associated together for a common purpose of engaging in a course of conduct." <u>United States v. Turkette</u>, 452 U.S. 576, 583 (1981).

The record reflects that a number of Freedom Medical

employees, both during and after their employment with the company, formed their own businesses to sell, rent, and refurbish medical equipment. They are the following: (1) Harbor Medical, LLC (Salario/Rivera/Gillespie); (2) AML (Rivera/Gillespie); (3) Med Logic (Gillespie); (4) Signature Medical (Mr. Hall); (5) SEP (Mr. Hall/Gillespie); and (6) U.S. Med (Salario/Bhatia).

The record further reflects that Gillespie had significant involvement with each entity, either as a principal or as a strategic partner. Gillespie used his position as a vice president of Freedom Medical and his fictitious business entity, Med Logic, to channel equipment to AML, U.S. Med, and Signature Medical. He also diverted business opportunities to each of Signature Medical, SEP, AML, and U.S. Med, and provided proprietary Freedom Medical information to SEP and Salario. Moreover, the various businesses owned by Freedom Medical alumni engaged in some transactions with one another. U.S. Med purchased, rented, and serviced many pieces of medical equipment from Signature Medical and occasionally acquired equipment from SEP. Both Signature Medical and Salario, on behalf of U.S. Med, also supplied AML with equipment.

The problem for Freedom Medical is that these constituent relationships do not all coalesce to form a meaningful whole. By and large, the cohesive competitive ring among all of the defendants that was alleged in the second

amended complaint has not been borne out by the evidentiary record.  Of course, the briefing presently before the Court understandably focuses on the U.S. Med Defendants' alleged association with an enterprise.  The Court, therefore, decides only whether the record can be read to establish the existence of an enterprise that included any of the U.S. Med Defendants or in which any of them participated.

As an initial matter, the fact that each defendant or cluster of related defendants formed bilateral business relationships with Gillespie does not show that all of the defendants collaborated together to achieve a common purpose.  Standing alone, such evidence demonstrates parallel conduct among Gillespie and his various associates, not a horizontal agreement or "concerted action" among all of these outer partners.  In re Ins. Brokerage, 618 F.3d at 374.  In the words of the Third Circuit, the arrangement resembles a "hub-and-spoke" system without any connective, outer rim.  Id.

This is true even if certain of these bilateral dealings, or other actions taken by the principals of the above-referenced companies, either by design or effect, were detrimental to the interests of Freedom Medical or were even unlawful.  Boyle confirmed that, although a pattern of illegal activity may be sufficient to satisfy both the enterprise and racketeering elements of a RICO claim, "the existence of an

enterprise is an element distinct from the pattern of
racketeering activity and 'proof of one does not necessarily
establish the other.'"  556 U.S. at 947 (quoting Turkette, 452
U.S. at 583); see also Bergrin, 650 F.3d at 265.  Individuals'
separate and uncoordinated commission of RICO predicate acts does
not automatically create an enterprise.  Boyle, 556 U.S. at 947
n.4.  There must be structural unity and coordination to the
conduct.

        Here, Freedom Medical does not explain how many of the
U.S. Med Defendants' interactions with Gillespie were related to
a larger scheme.  Most of this conduct was merely
individualistically opportunistic.  For instance, Salario's claim
to know someone at Freedom Medical who could steal equipment,
made to Gillespie between 2004 and 2006, in no way aided a larger
association.  As the defendants point out, Salario could not have
been speaking about Mr. Hall, as he had years before stopped
working at Freedom Medical.  There is no additional evidence that
the unnamed insider was a member of the alleged enterprise, that
Salario brought in Gillespie or any other party on that endeavor,
or that Salario intended to use his nefarious connection for the
benefit of any entity other than U.S. Med.  Similarly, it is not
at all evident how Salario's involvement in channeling business
to Techmate while still a Freedom Medical employee, establishing
U.S. Med, facilitating Nolen's departure to take a job at

Techmate, or using Freedom Medical branch managers Janssens and Burgess to obtain rental opportunities with the plaintiff's customers was done to further the interests of a multiparty enterprise instead of, or in addition to, the business interests of Salario's company, U.S. Med, and its forerunner, Techmate.

The fact that U.S. Med retained and resold or re-rented equipment received directly from Freedom Medical, and without Freedom Medical's permission, also does not aid Freedom Medical's position that a wide-ranging scheme among all defendants existed. Freedom Medical denies that it ever "convey[ed] title" to any of these devices, but does not deny that it supplied U.S. Med with this equipment for servicing. See PX-USM 18 ¶ 26(d). U.S. Med's retention of these devices was, therefore, achieved through a bilateral transaction with Freedom Medical. There is no suggestion that any other alleged member of the enterprise was instrumental in brokering that deal. At best, a factfinder could infer that Gillespie, who brokered other deals, orchestrated these transfers and that the U.S. Med Defendants' retention and redistribution of the inventory amounted to conversion or theft. Even so, then, U.S. Med obtained this equipment through illicit dealings with Gillespie, a singular hub-and-spoke relationship. Receipt of this inventory bears no relation to a broader enterprise or furthering its common objectives.[21]

_____

[21] At oral argument, Freedom Medical's counsel made much of supposed consistently "false" statements by Bhatia regarding U.S.

Equally unpersuasive is Freedom Medical's attempt to attribute to all defendants, and in particular the U.S. Med Defendants, an agreement to participate in a theft ring run through the Signature entities. Mr. Hall, who has been punished criminally for his conduct, purchased and then resold or rented,

---

Med's lawful ownership of LTV ventilator B01518. 3/14/13 Hr'g Tr. at 52-56. Bhatia testified at his December 2006 deposition that U.S. Med had documentation reflecting its ownership of that ventilator. See PX-USM 6 at 107-08. In addition, in 2006, Bhatia provided Pulmonetics, the ventilator's manufacturer, with an invoice supposedly evidencing the fact that U.S. Med had purchased BO1518 from Freedom Medical. PX-USM 40 (Pulmonetics Record - LTV Ventilator B01518).

Freedom Medical argues that this information was incorrect. Pulmonetics determined that the invoice received from Bhatia did not demonstrate that U.S. Med had bought the ventilator from Freedom Medical and instead reflected that Freedom Medical owned the equipment. Id. Moreover, Freedom Medical contends that no such ownership documentation has ever been provided in discovery. Rather, U.S. Med has produced an invoice demonstrating that it owns LTV ventilator BO1508, a ventilator whose serial number differs by one digit. See PX-USM 41. Freedom Medical states that it informed Bhatia of this perceived error.

Freedom Medical further asserts that U.S. Med's lack of ownership was well known to Bhatia by September 2012 when he stated, in an affidavit, that U.S. Med had purchased BO1518 from Freedom Medical. PX-USM 16 ¶ 21(ccc). Freedom Medical's basic argument is that Bhatia's consistently false statements are circumstantial evidence of his consciousness of guilt, from which the Court can infer that he knew this unit was stolen when it was received.

Even accepting Freedom Medical's gloss on Bhatia's testimony, Bhatia's statements would not be enough to demonstrate participation in a RICO enterprise. He asserts, and Freedom Medical does not challenge, that U.S. Med received ventilator BO1518 directly from Freedom Medical. Even if unlawfully retained, U.S. Med received this equipment through its own bilateral dealings with Freedom Medical or Gillespie and not due to any participation in a putative enterprise.

through Signature Medical, unlawfully obtained Freedom Medical equipment.  On several occasions, U.S. Med purchased or rented some of this inventory, as did Rivera.  Gillespie also acquired some stolen units through an equipment exchange.

The summary judgment record does not demonstrate, however, that the defendants banded together to pursue the common objective of stealing this equipment or that it was part of an overall, concerted plan.  The Court has not been presented with evidence that Rivera, Salario, or Bhatia agreed with Mr. Hall to steal Freedom Medical equipment, solicited the equipment because it was stolen, or even knew, at the time of any transaction, that the equipment received from Signature Medical rightfully belonged to Freedom Medical.  Although Mr. Hall and various other Signature employees and affiliates, some of whom are defendants in this matter, may have had a "common purpose" to steal equipment, there is no genuine issue of material fact that the U.S. Med Defendants shared it.

To the contrary, according to the record, the earliest that Salario and Bhatia became aware of allegations that Signature Medical had actually stolen equipment was after Freedom Medical began an internal investigation into its missing equipment on or after April 26, 2006.  Gillespie learned, during the course of Freedom Medical's investigation that devices he had previously obtained from Signature Medical had in fact been

stolen.  He then imparted that information to Salario.  In May, Salario learned from Freedom Medical executives that additional equipment in U.S. Med's possession was stolen.  With the exception of one unit received for follow-up service in May 2006, all of the potentially stolen pieces of equipment had been received into U.S. Med's possession prior to the start of Freedom Medical's investigation and before the U.S. Med Defendants learned of the thefts.  See PX-USM 16 ¶ 21.

Up to that point, Salario and Bhatia were only ever aware that there was a title discrepancy between Freedom Medical and Signature Medical regarding two Pulmonetics ventilators. That did not reasonably place them on notice that all of their dealings with Signature Medical involved equipment that was stolen from Freedom Medical.  Salario testified at deposition, and Freedom Medical has failed to refute, that it is common for discrepancies regarding title to arise, given that "equipment gets bought and sold many times," and Bhatia has stated that having proof of ownership for inventory is "not normal in the industry."  PX-USM 33 at 171-72; USM Reply Ex. 3 (11/10/08 Bhatia Dep.) at 239-40.  Furthermore, it is not as if Salario and Bhatia did nothing to resolve the title dispute.  Salario called Mr. Hall and instructed him to iron out the ownership issue with the manufacturer, Pulmonetics.[22]

---

[22] It is true that Salario and Bhatia eventually rented those ventilators to their own customers, possibly without

-50-

For his part, Mr. Hall has stated that he never spoke to Bhatia, Salario, or anyone else at U.S. Med about stealing equipment from Freedom Medical. Bhatia and Salario also claim to have known nothing about the illicit nature of Signature Medical's inventory at the time it was received. Freedom Medical offers only a hearsay statement from Ragazzo, who did work for Signature Medical, and conjecture to argue that Salario at all times knew about the stolen nature of the equipment received from Signature Medical. That will not suffice to establish a genuine issue of material fact regarding active involvement by the U.S. Med Defendants in stealing Freedom Medical's equipment.

Certainly, Freedom Medical cannot impute common membership in an enterprise simply from the fact that the U.S. Med Defendants and the Signature entities engaged in business dealings. Freedom Medical itself continued to do business with Signature Medical and U.S. Med during the time the RICO enterprise is supposed to have been active. PX-H 1 at 79-82; PX-USM 16 ¶ 21(bb). For that matter, the owners of Freedom Medical, Greco and Gwynn, also engaged Gillespie to find a customer for their own side deal of medical equipment. There is no connective thread or "common interest" involved in such deals apart from the pursuit of profit and business growth that generally drives

_____

Signature Medical's permission. That no more implicates them in a joint venture to steal inventory from Freedom Medical than an independent effort to rip off the Signature businesses, though.

market participants to form commercial transactions.  The U.S. Med Defendants were neither part of a common undertaking to steal, nor did they "knowingly further the illegal aims of" any theft enterprise that may have existed.  See Urban, 404 F.3d at 770.

Moreover, although Harbor Medical, LLC, was started by all three of Salario, Rivera, and Gillespie, the three deals in which it engaged between 2001 and 2006 do not reasonably demonstrate that it was part of an association-in-fact enterprise or help establish the existence of such a larger organizational structure.

The only endeavor common to all of the key defendants in this suit is the diversion of business opportunities to AML. According to Gillespie, after Rivera formed AML, Gillespie channeled to the new company a number of opportunities to engage in sales or rentals to Freedom Medical customers.  U.S. Med and Signature Medical then provided the equipment AML needed to complete its customer orders.  Beyond stating that there were a number of such deals diverted to AML, Gillespie does not state how long this arrangement existed.  As the Boyle Court noted, an enterprise necessarily must have "'affairs' of sufficient duration to permit an associate to 'participate' in those affairs through 'a pattern of racketeering activity.'"  556 U.S. at 946 (quoting 18 U.S.C. § 1962(c)).  As discussed above, such a

pattern must last more than a few months.  <u>H.J. Inc.</u>, 492 U.S. at 242; <u>see also</u> <u>Tabas v. Tabas</u>, 47 F.3d 1280, 1293 (3d Cir. 1995) (en banc).  Without additional evidence, a reasonable factfinder could not find that this business arrangement, even assuming it operated pursuant to a common purpose and structure, was of sufficient duration to constitute an enterprise.  In addition, there is no evidence revealing what qualifying predicate acts the U.S. Med Defendants committed in support of these deals or whether there was a sufficient number of them to constitute a "pattern."  Indeed, although possibly facilitating breaches of fiduciary and contractual duties owed by Gillespie to Freedom Medical, it is not clear what federal laws were broken in the course of these transactions.

In sum, Freedom Medical has failed to establish the existence of an enterprise involving any or all of the U.S. Med Defendants, and its RICO claim against them must fail.


B.    <u>RICO Conspiracy Claim</u>

Section 1962(d) of the RICO statute makes it illegal to conspire to violate one of RICO's substantive provisions, such as § 1962(c).  18 U.S.C. § 1962(d).  To be held liable as a RICO conspirator, a defendant need not himself commit or agree to undertake all acts necessary to make out a § 1962(c) violation.  <u>Salinas v. United States</u>, 522 U.S. 52, 65 (1997); <u>In re Ins.</u>

Brokerage, 618 F.3d at 372-73; see also Beck v. Prupis, 529 U.S. 494, 506-07 (2000).  The defendant need only agree to facilitate commission of conduct prohibited under RICO.  See In re Ins. Brokerage, 618 F.3d at 372-73 & n.71; Smith v. Berg, 247 F.3d 532, 538 (3d Cir. 2001).  Consequently, a RICO conspiracy claim cannot survive where the plaintiff fails to provide evidence of "'an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] offense.'"  In re Ins. Brokerage, 618 F.3d at 373 (quoting Salinas, 522 U.S. at 65) (alteration in the original); see also Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1191 (3d Cir. 1993).

        As already discussed, the evidence in the record either fails to demonstrate that the moving defendants undertook actions as part of a coordinated enterprise or that the one endeavor involving all key putative enterprise participants amounted to a § 1962(c) violation.  A reasonable factfinder could not infer from these actions an agreement on the part of the moving defendants to facilitate a RICO scheme.  Nor has Freedom Medical offered any other proof that the moving defendants were hopeful conspirators who agreed to form a RICO enterprise but were stymied before being able to carry their plan into action. Accordingly, Freedom Medical has not made out a reasonable claim of a RICO conspiracy against the U.S. Med Defendants or Ms. Hall, and the Court will grant them summary judgment on this claim.

C.    <u>State Law Claims</u>

In addition to its RICO claims, Freedom Medical asserts the following state law claims against the moving defendants:

(1)    <u>Breach of Fiduciary Duty</u>: Salario;

(2)    <u>Aiding and Abetting Breach of Fiduciary Duty</u>: Salario, Bhatia, and U.S. Med;

(3)    <u>Misappropriation of Trade Secrets</u>: Salario and U.S. Med;[23]

(4)    <u>Breach of Contract</u>: Salario;

(5)    <u>Tortious Interference with Contract</u>: Salario and U.S. Med;

(6)    <u>Civil Conspiracy</u>: Salario, Bhatia, U.S. Med, and Ms. Hall;

(7)    <u>Conversion</u>: Salario, Bhatia, U.S. Med, and Ms. Hall; and

(8)    <u>Unjust Enrichment</u>: Salario, Bhatia, and U.S. Med.[24]

---

[23] Freedom Medical originally included Ms. Hall as a defendant on this count. At oral argument, however, counsel for Freedom Medical conceded that the plaintiff lacked evidence of Ms. Hall's participation in the misappropriation of trade secrets and that this claim is no longer being alleged against her. 3/14/13 Hr'g Tr. at 95-96.

[24] Two of Freedom Medical's state law claims, (a) aiding and abetting breach of fiduciary duty and (b) unjust enrichment, are pled against defendant "Hall." Second Am. Compl. ¶¶ 151, 158. It is unclear whether the allegations refer to Mr. Hall or Ms. Hall. In her motion for summary judgment, Ms. Hall states that she had only been named as a defendant on the misappropriation of trade secrets, civil conspiracy, and conversion counts, and

The second amended complaint is somewhat vague as to the precise scope of each of these claims, and the summary judgment briefing has not much illuminated their contours. At oral argument, however, counsel for Freedom Medical clarified on behalf of his client the specific acts that form the basis for each claim.

The U.S. Med Defendants argue that the Court need not even consider the merits of the state law claims against them, asserting that, as a threshold matter, the Court should decline to exercise supplemental jurisdiction over the state causes of action. In the alternative, the U.S. Med Defendants contend that Freedom Medical should be barred by the doctrine of judicial estoppel from asserting the first five state law claims listed above, all of them business torts, and that no genuine issues of material fact exist with respect to the remaining three claims for civil conspiracy, conversion, and unjust enrichment. The Court is not persuaded by the U.S. Med Defendants' arguments and will deny their motion for summary judgment with respect to Freedom Medical's state law claims.

The Court will, however, grant Ms. Hall's motion for

_____

Freedom Medical did not argue otherwise in its response. At oral argument, Freedom Medical confirmed that the three state law claims identified by Ms. Hall are the only ones against her. See 3/14/13 Hr'g Tr. at 82. Accordingly, the Court understands that Freedom Medical's claims of aiding and abetting breach of fiduciary duty and unjust enrichment are alleged against Mr. Hall and not Ms. Hall.

summary judgment on the two state law claims remaining against
her, as no triable issues exist on either claim.[25]

    1.   <u>U.S. Med Defendants</u>

    a.   Declining to Exercise Supplemental
    <u>Jurisdiction</u>

The U.S. Med Defendants contend that, if the Court
grants their motion for summary judgment on Freedom Medical's
federal RICO claims, there exists no compelling reason for
maintaining supplemental jurisdiction over the state law
claims.[26] "Where the claim over which the district court has
original jurisdiction is dismissed before trial, the district
court must decline to decide the pendent state claims unless
considerations of judicial economy, convenience, and fairness to
the parties provide an affirmative justification for doing so."
<u>Bright v. Westmoreland Cnty.</u>, 443 F.3d 276, 286 (3d Cir. 2006)
(alteration and citation omitted).

Sound reasons exist for continuing to exercise
supplemental jurisdiction in this case.  Even after granting

---

[25] Both Ms. Hall and Freedom Medical have assumed, and the
Court will accept, that Pennsylvania law governs Freedom
Medical's state law claims against her.

[26] No party has suggested and it does not readily appear
from the pleadings and record in this case that the Court can
independently assert subject matter jurisdiction over Freedom
Medical's state law claims based on diversity among the parties.

summary judgment to the moving defendants on Freedom Medical's RICO claims, parallel RICO and state law claims against the non-moving defendants remain.  Also, this case was filed in this court over six years ago.  It would contravene the interests of judicial economy, convenience, and fairness to the parties to dismiss these claims for adjudication by a new judge after such a significant investment of time and resources in this forum both by the Court and the parties.  The Court finds that proper exercise of its discretion counsels in favor of maintaining jurisdiction over Freedom Medical's state law claims.

b.    <u>Judicial Estoppel</u>

The U.S. Med Defendants next argue that Freedom Medical should be precluded from asserting certain of its state law claims against them based on the doctrine of judicial estoppel. Judicial estoppel is a judge-made rule that prevents a party from asserting a position in litigation that is inconsistent with one previously maintained in the same or a prior proceeding.  <u>New Hampshire v. Maine</u>, 532 U.S. 742, 749 (2001); <u>Macfarlan v. Ivy Hill SNF, LLC</u>, 675 F.3d 266, 272 (3d Cir. 2012).  Application of the doctrine is an "extraordinary remed[y]" that may be invoked only to stop a "miscarriage of justice" through wrongful use of the courts.  <u>Ryan Operations G.P. v. Santiam-Midwest Lumber Co.</u>, 81 F.3d 355, 356 (3d Cir. 1996) (quotation marks and citation

omitted; alteration in the original); see also In re Kane, 628
F.3d 631, 638 (3d Cir. 2010).

When faced with seemingly inconsistent litigation
stances by a party, a court should look to three criteria to
determine whether application of judicial estoppel is proper:
(1) the party to be estopped must have taken two positions that
are "irreconcilably inconsistent;" (2) the change in position
must be due to bad faith, identified as the "intent to play fast
and loose with the court;" and (3) employing judicial estoppel is
"tailored to address the harm identified and no lesser sanction
would adequately remedy the damage done by the litigant's
misconduct."  Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen.
Motors Corp., 337 F.3d 314, 319 (3d Cir. 2003) (quotation marks,
citation, and emphasis omitted).  Judicial estoppel is a "fact-
specific" remedy.  Kane, 628 F.3d at 638.


### (1)  Irreconcilable Inconsistency

The U.S. Med Defendants here argue that Freedom Medical
has taken contradictory positions in its prior bankruptcy
proceedings, begun in 2004 and ending on May 26, 2006, and in
this action.  They contend that Freedom Medical was aware, either
prior to initiating or during the pendency of its bankruptcy
proceedings, of potential causes of actions against them that
have ripened into the following claims now at issue in this suit:

(1) breach of fiduciary duty; (2) aiding and abetting breach of fiduciary duty; (3) misappropriation of trade secrets; (4) breach of contract; and (5) tortious interference with contract. <u>See</u> U.S. Med Def'ts' Mot. Summ. J. at 19; 3/14/13 Hr'g Tr. at 82-83. The U.S. Med Defendants cite the three cease and desist letters sent by counsel for Freedom Medical in September and October 2003 as evidence that Freedom Medical knew it had these possible state law causes of actions.  In those letters, Freedom Medical threatened legal action against Salario and Bhatia if Salario did not stop breaching provisions of his employee engagement agreement and non-compete/non-disclosure agreement and using Freedom Medical's "confidential information" in the course of his dealings with Bhatia's company, Techmate.  <u>See, e.g.</u>, Docket No. 402-3.

Nevertheless, Freedom Medical did not list these potential causes of action, which constitute debtor assets, on its bankruptcy forms, in violation of disclosure obligations imposed by the Bankruptcy Code.  Under the Bankruptcy Code, debtors need not list every "hypothetical," "tenuous," or "fanciful" claim on an asset disclosure form.  <u>Krystal Cadillac</u>, 337 F.3d at 323.  Rather, a debtor's disclosure obligation is triggered where it "'has enough information . . . prior to confirmation to suggest that it may have a possible cause of action.'"  <u>Id.</u> (quoting <u>In re Coastal Plains</u>, 179 F.3d 197, 208

(5th Cir. 1999)) (alteration in the original).  Freedom Medical

argues that it lacked any such notice prior to or during

bankruptcy.  It maintains that its present claims became manifest

only after it emerged from bankruptcy in the course of its

internal investigation into theft of inventory and business

opportunities, which commenced in April 2006 and led to the

filing of the instant lawsuit in July of that year.

        As a preliminary matter, the Third Circuit has not

explicitly held that a party takes irreconcilably inconsistent

positions when, as a debtor in bankruptcy proceedings, it utterly

fails to disclose to its creditors a known cause of action it has

against another and then pursues that claim in court.  Our Court

of Appeals has, on several occasions, "expressly left open

[whether] . . . nondisclosure, standing alone, can support a

finding [of irreconcilable inconsistency] . . . within the

meaning of the judicial-estoppel doctrine."  Kane, 628 F.3d at

639 (quoting Ryan Operations, 81 F.3d at 362) (quotation marks

omitted; alterations in the original); see also Oneida Motor

Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 419 (3d Cir.

1988).[27]

---

        [27] Both Oneida Motor Freight and Krystal Cadillac, which the
U.S. Med Defendants cite for support, are distinguishable.  In
Oneida Motor Freight, the court specifically declined to answer
the question posed above.  Rather, it found that the debtor took
irreconcilably inconsistent positions when it listed a $7.7
million debt to a bank on its schedule of liabilities without
mentioning the possibility of an offset based on the bank's
alleged breach of certain lending agreements, and then brought a

-61-

Even assuming that a debtor's later suit on an undisclosed claim, without more, constitutes irreconcilable inconsistency, it is not clear that judicial estoppel bars Freedom Medical's claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and tortious interference with contract. According to Freedom Medical's clarified allegations, none of these claims relates to the issues raised in the cease and desist letters issued in the fall of 2003. The breach of fiduciary duty claim against Salario pertains to his diversion of equipment and business opportunities to Techmate during his employment at Freedom Medical in 2003, and his creation of Harbor Medical, LLC with Rivera and Gillespie at a time when all three were still employed by Freedom Medical. 3/14/13 Hr'g Tr. at 93, 96; Docket No. 403 (Pl.'s Opp. to U.S. Med Def'ts' 10/3/08 Mot.

_____

separate breach of contract action based on violation of those lending agreements. 848 F.2d at 417, 419. In Krystal Cadillac, shortly after the debtor automobile dealership filed for Chapter 11 protection, an administrative agency upheld a creditor's decision to terminate one of Krystal Cadillac's franchise agreements. 337 F.3d at 317. Krystal Cadillac still listed the franchise covered by the terminated agreement as an asset, but did not disclose its claim that dissolution of the franchise agreement had violated the automatic stay imposed by the bankruptcy court. Id. at 317-18. Its later suit against the creditor based on violation of the automatic stay was deemed irreconcilably inconsistent with its bankruptcy disclosures. Id. at 320-21.

In essence, Oneida Motor Freight and Krystal Cadillac involved not just a failure to disclose potential causes of actions, but misleading asset disclosures. The debtor in each case affirmatively provided its creditors with an inaccurate picture of a particular asset or liability.

Summ. J.) at 22.  This claim is somewhat connected to Salario's

involvement with Techmate and U.S. Med following departure from

Freedom Medical; however, the letters from Freedom Medical dealt

only with post-departure issues.  The other state law claims for

aiding and abetting breach of fiduciary duty and tortious

interference with contract relate to actions taken by the U.S.

Med Defendants between 2004 and 2006.  During that period,

Salario asked Gillespie to provide him with Freedom Medical's

non-public inventory information and Gillespie funneled business

opportunities to U.S. Med.  <u>See, e.g.</u>, PX-H 2 ¶¶ 20, 22.  Salario

also solicited Janssens and Burgess, both Freedom Medical branch

managers, to arrange rental deals with customers on behalf of

U.S. Med.

     Although Freedom Medical's internal investigation,

during which it appears to have learned of the factual bases for

these claims, began before its bankruptcy case ended, the U.S.

Med Defendants have not presented evidence demonstrating that

Freedom Medical gained knowledge of the particular claims at

issue here early in its investigation and before discharge from

bankruptcy.  Especially given the "extraordinary" nature of the

remedy of judicial estoppel and the necessity for

"irreconcilable" inconsistency of positions, the Court will not

lightly impute knowledge of these three other potential claims.

     At best, the U.S. Med Defendants can demonstrate that

Freedom Medical was aware of a possible breach of contract claim
and a misappropriation of trade secrets claim against Salario
before it ever sought Chapter 11 protection.[28]  Freedom Medical
declaims any "knowledge" of a potential right to sue in view of
the fact that Salario's attorney responded, in a letter of his
own, that he did not believe Salario was in violation of his
contractual obligations.  It is hard to imagine, however, that
Freedom Medical was mollified by such representations of non-
liability from its potential adversary's counsel.  In fact,
twelve days after receiving the letter from Salario's attorney,
Freedom Medical's counsel contacted him to reiterate its
allegations that Salario was in breach of his employment
contracts and had misappropriated Freedom Medical's proprietary
information.  Freedom Medical stated that it "intend[ed] to
vigorously protect its rights and pursue all available legal
remedies against [Salario]."  Docket No. 402-6.  Freedom Medical
obviously continued to contemplate legal action against Salario
even after receiving a response from his lawyer, and it still
seeks to hold Salario liable for those actions to this day.

(2)  Bad Faith

For judicial estoppel to bar Freedom Medical from

---

[28] Of course, Freedom Medical also points to evidence that
Salario improperly obtained its customer information after he
left Freedom Medical's employ, which was not mentioned in its
cease and desist letters in the fall of 2003.

asserting its breach of contract and misappropriation of trade secrets claims, its inconsistent positions must have been taken in bad faith, defined as an intent to play fast and loose with the court. Krystal Cadillac, 337 F.3d at 319-20 (citation omitted). A rebuttable inference of bad faith arises where a debtor has knowledge of a potential claim and motive to conceal it. Id. at 321; Ryan Operations, 81 F.3d at 363.

The U.S. Med Defendants argue that Freedom Medical, as a debtor in bankruptcy with fewer assets than debts, naturally had a motive to underestimate its assets and conceal potential causes of actions from its creditors. None of the cases on which the defendants rely infers bad faith so broadly. If it were otherwise, presumably any Chapter 11 debtor who, by mistake or carelessness, failed to identify a claim as an asset could be precluded from later litigating that claim.

In Krystal Cadillac, for instance, the court determined that Krystal Cadillac's decision to list its terminated franchise as an asset, while simultaneously failing to disclose its claim against the creditor who terminated the franchise agreement in violation of the automatic bankruptcy stay, could only be explained by "an intent to hide the claim from creditors." 337 F.3d at 323. The bankruptcy court in that case similarly concluded that "Krystal limited the reference to the instant claim in order to conceal the claims from creditors in the hope

of retaining any recovery for itself." Id. at 320.  In addition,

Krystal Cadillac instituted its separate suit against its

creditor on the undisclosed claim while still in bankruptcy.  Id.

at 318-19.  Finally, Krystal Cadillac's owner, who had agreed to

expend his own funds to pay claims and expenses associated with

his company's Chapter 11 reorganization, was actively engaged in

negotiations with unsecured creditors to reduce the amount of

their claims, suggesting a motive to conceal assets.  Id. at 323.

        Here, the U.S. Med Defendants offer no evidence as to

the concessions elicited from any of Freedom Medical's creditors

in securing their agreement to its reorganization plan.[29]  Nor

are the undisclosed claims integrally tied to the bankruptcy

itself or to a dispute over a particular listed asset, such that

Freedom Medical's failure to disclose bespeaks an intentional

choice.  Unlike the debtor in Krystal Cadillac who was

simultaneously engaged in Chapter 11 proceedings and its separate

suit, Freedom Medical learned of Salario's alleged misconduct

nearly a year before it filed for bankruptcy and brought suit

several months after its bankruptcy proceeding ended.  This

timing is less suggestive of bad-faith non-disclosure.  The Court

recognizes the importance of honest and accurate disclosure in

---

        [29] It is not imperative for judicial estoppel purposes that
the party to be estopped benefitted from its initial litigation
position; however, the presence of an earlier benefit may help
establish a party's intent to play fast and loose with the
judicial system.  Krystal Cadillac, 337 F.3d at 324 & n.11; Ryan
Operations, 81 F.3d at 361.

bankruptcy proceedings.  The facts of this case do not, however, demonstrate that Freedom Medical's non-disclosure can be attributed to devious intent rather than carelessness.  And "careless or inadvertent nondisclosures" do not amount to "deliberate manipulation when administering the 'strong medicine' of judicial estoppel."  <u>Ryan Operations</u>, 81 F.3d at 364 (quoting <u>Chaveriat v. Williams Pipe Line Co.</u>, 11 F.3d 1420, 1428 (7th Cir. 1993)).

In any event, as the Third Circuit has stated, invocation of judicial estoppel is a decision left to a court's discretion and "a given set of circumstances does not . . . necessarily compel its application."  <u>Kane</u>, 628 F.3d at 638. Accordingly, the Court declines to exercise its equitable power of estopping Freedom Medical from raising its business tort claims against the U.S. Med Defendants in this later litigation.

c.   <u>Lack of Genuine Issues of Material Fact</u>

With respect to the civil conspiracy, conversion, and unjust enrichment counts, which are not covered by the U.S. Med Defendants' judicial estoppel argument, the U.S. Med Defendants argue, without elaboration, that no genuine issue of material fact exists and that they are entitled to summary judgment.  This summary assertion does not satisfy the U.S. Med Defendants' burden of demonstrating the absence of a genuine issue of

material fact on these claims.  See <u>Celotex Corp.</u>, 477 U.S. at 323.

Nor are these claims wholly derivative of Freedom Medical's RICO claims.  For instance, although the U.S. Med Defendants may not have combined with others to steal Freedom Medical's equipment, they may still be found liable for conversion based on their possession of Freedom Medical property without its permission.  See <u>Universal Premium Acceptance Corp. v. York Bank & Trust Co.</u>, 69 F.3d 695, 704 (3d Cir. 1995); <u>Chrysler Credit Corp. v. Smith</u>, 643 A.2d 1098, 1100 (Pa. Super. Ct. 1994).  Additionally, they need not have operated or managed a RICO enterprise or conspired to commit a RICO violation to be found liable for engaging in an unlawful civil conspiracy.  The Court, therefore, will not grant the U.S. Med Defendants summary judgment on these claims.

2.   <u>Ms. Hall</u>

Ms. Hall has moved for summary judgment, citing the absence of any genuine issues of material fact with respect to the claims of civil conspiracy and conversion maintained against her.  The Court will grant her summary judgment on both claims.

a.   <u>Civil Conspiracy</u>

The essential elements of civil conspiracy under

Pennsylvania law are the following: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act in furtherance of the common purpose; and (3) actual legal damage.  Phillips v. Selig, 959 A.2d 420, 437 (Pa. Super. Ct. 2008).  A plaintiff must prove an underlying tort to sustain a claim of civil conspiracy.  Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 407 (3d Cir. 2000).

Freedom Medical asserts that the defendants' alleged RICO enterprise also constitutes a civil conspiracy.  For much the same reason that the Court finds the RICO claims against Ms. Hall to be lacking, namely, her lack of awareness of any such unlawful endeavor or knowing participation in such a scheme, it also concludes that Freedom Medical's civil conspiracy claim against her must fail.

b.    Conversion

Conversion is defined as "the deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification."  Universal Premium Acceptance Corp., 69 F.3d at 704 (quotation marks and citation omitted).  Although the exercise of control over the property must be intentional, the plaintiff need not have proof that the defendant specifically

intended to commit a wrong; "a good faith purchaser of the goods from the converter is also a converter and must answer in damages to the true owner." <u>Underhill Coal Mining Co. v. Hixon</u>, 652 A.2d 343, 345 (Pa. Super. Ct. 1994). Freedom Medical asserts that the moving defendants, including Ms. Hall, took, received, or maintained possession of Freedom Medical inventory listed on its missing equipment list, without Freedom Medical's consent.

As noted in Section II.A.1, <u>supra</u>, there is nothing connecting Ms. Hall to the exercise of control over equipment or the TeleMagic database management system stolen from Freedom Medical. They were never in her, as opposed to the Signature entities', possession, and she is entitled to summary judgment on this claim.

III. <u>Conclusion</u>

For the foregoing reasons, the Court will grant in full Ms. Hall's motion for summary judgment, and will grant in part and deny in part the U.S. Med Defendants' motion for summary judgment. An appropriate order issues separately.